**Christopher Anthony YOUNG,**
**Appellant,**

**v.**

**The STATE of Texas.**

No. AP–75352.

Court of Criminal Appeals of Texas.

April 22, 2009.

Rehearing Denied June 10, 2009.

Michael D. Robbins, San Antonio, for appellant.

Crystal Chandler, Asst. Crim. D.A., San Antonio, Jeffrey L. Van Horn, State's Attorney, Austin, for State.

## OPINION

### PER CURIAM.

The appellant was convicted in February 2006 of capital murder.[1] Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071 §§ 2(b) and 2(e), the trial judge sentenced the appellant to death.[2] Direct appeal to this Court is automatic.[3] After reviewing the appellant's fifteen points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

The appellant challenges the sufficiency of the evidence at both phases of trial. We shall address these issues first. The remaining points of error will be addressed in the order presented in the briefs.

■ In points of error one and two, the appellant contends that the evidence is both legally and factually insufficient to prove that he committed capital murder. He argues that the State's primary evidence, the store surveillance video, is not enough, legally or factually, to convict him of murdering the victim "while in the course of committing or attempting to commit the offense of robbery."[4] Specifically, the appellant asserts that: (1) the tape's video sequence does not include conduct by the appellant that would imply that he was robbing or attempting to commit a robbery at the victim's store; and (2) the tape's sound in the corresponding audio is so "muddled" that it would be almost impossible for the jury to decipher any recorded dialogue that indicates that the appellant was in the course of committing robbery or attempting to commit robbery at the victim's store. The appellant also claims that the eyewitness testimonies of convenience store patrons, Raul Vasquez, Jr. and Hattie Helton, contributed little, if any, evidence to prove that the murder occurred in the course of a robbery.

The evidence at trial established that on November 21, 2004, within minutes of stealing a red Mazda Protégé from its owner at gunpoint, the appellant drove the stolen vehicle to the mini-mart/dry cleaners owned by Hasmukhbhai Patel. The following events were captured on the store's surveillance camera:[5] the appellant, wearing a black shirt and light-colored shorts, entered the store at 9:37 a.m. and appeared to be holding something hidden within his left pocket. The appellant looked around the front of the store before moving behind Patel, who was working in the rear of the store. The appellant asked Patel the cost of cleaning clothes at the store. The appellant's voice immediately changed to a lower tone, and the appellant stated, "Alright [sic], give up the money. I'm not playing. I'm not fucking playing." Patel came into view as he quickly moved behind the counter towards the cash register, and the appellant could be seen leaning over the front counter with his left arm completely extended, pointing a silver handgun at Patel. Again, the appellant

1. TEX. PENAL CODE § 19.03(a).

2. TEX.CODE CRIM. PROC. art. 37.071 § 2(g). Unless otherwise indicated all future references to Articles refer to the Texas Code of Criminal Procedure.

3. Art. 37.071 § 2(h).

4. TEX. PENAL CODE § 19.03(a)(2).

5. The surveillance camera provided both audio and video evidence of the crime. The camera also time and date-stamped the film so it evidences the exact timing of the offense.

ordered Patel to "give up the money," followed by the appellant's firing his first shot in the direction of Patel (now out of view behind the cash register). The appellant then yelled, "You be fucking up. I'm not playing. Give it up!" He fired a second shot in the direction of Patel. At this point, the alarm went off as Patel had apparently pushed the panic button on the system. The appellant, with his handgun still extended, followed the fleeing Patel to the opposite side of the front counter, and he could be heard over the alarm shouting, "I said give up the money, right." The video caught the appellant's movement behind the counter in the direction of the cash register. He was out of view for a few seconds before coming back into view and was then seen concealing his handgun under his shirt as he left the store.

Two of Patel's regular customers, Raul Vasquez, Jr. and Hattie Helton, happened to be in the parking lot of the store at the time of the offense. Vasquez had just pulled into a parking space in front of the store. Before he could exit his truck, he heard gunshots and looked up to see a black male leaning over the counter firing a gun at Patel. When the gunman left the store and got into a small red car, Vasquez called the police and then chased the gunman, but with no success. Vasquez was able to tell the police that the car's license plate had a "W" and that the perpetrator was wearing a black shirt and light-colored shorts. Helton, who was parked directly in front of the door, had just exited the store moments earlier and was in her car checking her "scratch-off" lottery tickets. When she heard the store alarm go off,

she looked up to see a black male exit the store and get in a small red car that was parked by the gas pumps. Once he was gone, Helton exited her car and called to Patel. When he did not answer, Helton called the police on a payphone located outside of the store. Both Vasquez and Helton identified the appellant as the perpetrator at trial.

The appellant was apprehended at approximately 11:00 a.m. when an officer spotted the red car parked at a house several miles away. The car's license plate began with a "W." The appellant was wearing a black shirt and light-colored shorts. The appellant's hands, shirt, and the steering wheel of the car all tested positive for gunshot residue. Patel's blood was found on one of the appellant's socks. Patel died from the gunshot wound to his chest. The murder weapon was never recovered.

 In reviewing a claim that evidence is legally insufficient to support a judgment, "the relevant question [on appeal] is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [6] This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." [7] Therefore, in analyzing the legal sufficiency, we will determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence, both direct and circumstantial, when viewed in the light most

---

**6.** *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**7.** *Id.*

favorable to the verdict.[8]

In a factual-sufficiency review, the evidence is reviewed in a neutral light rather than in the light most favorable to the verdict.[9] Evidence can be factually insufficient in one of two ways: (1) when the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, and (2) when the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust.[10] Although an appellate court's factual-sufficiency review of the evidence allows the court to second-guess the jury to a limited degree, the review should still be deferential to the jury's verdict.[11]

Capital murder occurs when a person intentionally commits murder while in the course of committing or *attempting to commit* robbery.[12] The State did not bear the burden of proving that the appellant completed the theft of the victim in order to establish the underlying offense of robbery or attempted robbery.[13] Rather, the requisite intent to rob may be inferred from circumstantial evidence, particularly the appellant's assaultive conduct.[14] In this case, there was ample evidence, circumstantial and direct, of assaultive conduct characteristic of attempted robbery

displayed by the appellant in the store surveillance tape.[15]

Despite the video sequence being short, and the events occurring quite fast, there is sufficient evidence on the surveillance tape that a jury could reasonably infer that the appellant murdered Patel in the course of an attempted robbery. Assaultive conduct, the gravamen of robbery, is demonstrated in the video by the appellant holding Patel at gunpoint after demanding the surrender of his money, forcing him behind the counter, and firing shots at Patel in response to his apparent refusal to give up the money. Vasquez's testimony that he saw a black man leaning over the front counter shooting at Patel is further evidence of assaultive conduct typical of a robbery.

The appellant insists the tape is devoid of "many of the hallmarks of robbery." To the contrary, the tape clearly evidences the appellant making several statements demonstrative of robbery, such as: "Alright [sic], give up the money. I'm not playing. I'm not fucking playing," and in the midst of firing shots at Patel shouting, "You be fucking up. I'm not playing. Give it up!" and, "I said give up the money, right." The appellant attacks the clarity of the dialogue between himself and Patel, most notably by his reference to State's witness Detective Sean Walsh's admission

---

8. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim.App.2007).

9. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim.App.), *cert. denied*, —— U.S. ——, 128 S.Ct. 282, 169 L.Ed.2d 206 (2007).

10. *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex.Crim.App.2006).

11. *Roberts*, 220 S.W.3d at 524; *Cain v. State*, 958 S.W.2d 404, 407, 410 (Tex.Crim.App. 1997).

12. *See* Tex. Penal Code § 19.03(a)(2)(emphasis added).

13. *See Bustamante v. State*, 106 S.W.3d 738, 740 (Tex.Crim.App.2003).

14. *See id.* at 740–41; *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex.Crim.App.1995).

15. *See Green v. State*, 840 S.W.2d 394, 401 (Tex.Crim.App.1992).

that he was unable to understand what was being said on the videotape. However, the jury had the opportunity to listen to the audio numerous times: during the presentation of evidence, during the State's closing arguments, and during its deliberations.[16] The jury could reasonably infer that the appellant intentionally committed murder in the course of committing or attempting to commit robbery based upon the combined and cumulative force of all the evidence.[17] Because we view the evidence in the light most favorable to the verdict, and we find that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we hold that the evidence was legally sufficient to support the jury's guilty verdict in this case.[18] Even in considering all the evidence in a neutral light, we find that the evidence was not so weak nor so outweighed by the great weight of contrary evidence as to make the verdict seem clearly wrong and manifestly unjust.[19] Thus, the evidence was factually sufficient to support the verdict. The appellant's first and second points of error are overruled.

 In point of error eleven, the appellant challenges the sufficiency of the evidence regarding future dangerousness.[20] In reviewing the sufficiency of the evidence at the punishment phase, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt.[21] A jury is permitted to consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[22]

 In its determination of the special issues, the jury is entitled to consider all the evidence presented at the guilt phase of the trial, in addition to the evidence presented at the punishment phase.[23] The circumstances of the offense and the events surrounding it may be sufficient in some instances to sustain a "yes" answer to the future-dangerousness special issue.[24]

The evidence in the instant case revealed that, immediately after he stole a car from a woman at gunpoint, the appellant drove to Patel's store, demanded mon-

16. We note that we have reviewed the surveillance video and were able to hear and understand the appellant's statements.

17. *See Clayton*, 235 S.W.3d at 778.

18. *See Jackson*, 443 U.S. at 319, 99 S.Ct. 2781.

19. *Roberts*, 220 S.W.3d at 524; *Watson*, 204 S.W.3d at 417.

20. *See* Art. 37.071 § 2(b)(1).

21. *Banda v. State*, 890 S.W.2d 42, 50 (Tex. Crim.App.1994).

22. *See Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Crim.App.1987). Among those factors are: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *Id.*

23. *Banda*, 890 S.W.2d at 51; *Valdez v. State*, 776 S.W.2d 162, 166–67 (Tex.Crim.App. 1989).

24. *Banda*, 890 S.W.2d at 51; *see also Hayes v. State*, 85 S.W.3d 809, 814 (Tex.Crim.App. 2002).

ey, and then shot Patel dead when Patel did not cooperate quickly enough. The appellant then left the store, disposed of his weapon, and picked up a prostitute with whom he could do drugs. This evidence of such a callous crime might alone support a finding of future dangerousness. However, the State presented further evidence that, immediately prior to the instant crime, the appellant also committed aggravated sexual assault on the woman from whom he stole the red Mazda Protégé.

At approximately 8:45 a.m. on November 21, 2004, Daphne Edwards was serving breakfast to her three young girls, all under the age of eight, when she realized that she was out of cigarettes. Edwards decided to leave her efficiency apartment and quickly drove to Patel's store about one block away while the children were eating. She was gone less than five minutes. Upon returning, she parked in front of the apartment and went straight inside. Almost immediately after her return, there was a knock on her door. Thinking it was her sister, Edwards opened the door to find the appellant standing there pointing a silver revolver at her. The appellant put the gun to Edwards' head, pushed his way in and asked her, "Where's the fucking money?" The appellant walked Edwards through the apartment at gunpoint to make sure no one else was home other than the children and that there was no access to a phone. The three children were scared and crying. Edwards gave the appellant all the money that she had in her purse—$28—but he told her that she had to give him something else because that was not enough money. The appellant then told Edwards to undress. He had Edwards tell her girls to go to the other room; however, as it was an efficiency apartment the girls could still see and hear everything that happened. The appellant then told Edwards that she was not disrobing quickly enough, so he shot the gun into the floor next to her feet. Edwards disrobed, and the appellant made her sit in a chair and perform oral sex on him. The appellant then made Edwards walk to the bathroom where the children could not fully see what was happening but the appellant could see the children. The appellant then made Edwards get on her knees and perform oral sex on him again.[25] The appellant then decided that he wanted Edwards to wear something "sexy" for him, so he took her back out of the bathroom to get her clothes. Edwards picked out an outfit but the appellant thought it was too long, so she picked out another outfit. He made her put on this outfit but did not allow her to put on any underwear. The appellant then decided that he wanted to leave. When Edwards protested that she would not leave her children, the appellant told her, "You did it before. I saw you." The appellant then walked over to the children and kissed each of them on the cheek and told them that their mommy would be back.

The appellant then forced Edwards, still at gunpoint, to leave the apartment and get into her red Mazda Protégé. He had her drive to the front of the apartment complex, at which point he decided that he wanted to drive. As he was getting out of the car, he told Edwards not to drive off or he would go back and kill her children. He told her to move to the passenger seat. As he was getting into the driver's seat, Edwards took the opportunity to escape— the appellant had left the passenger door open and Edwards saw some people in the

---

25. DNA tests confirmed the sexual assault by the appellant.

parking lot. She ran screaming to her cousin's apartment at the front of the complex where they called the police and then went to get the children. The appellant drove off in Edwards' car.

In addition to this evidence, the State also presented the appellant's previous convictions for possession of marijuana, evading arrest, and three assaults with bodily injury, two involving injury to his mother when he was a juvenile. The third assault occurred in September 2004 and involved his girlfriend, Chala Riley, who was eight-months pregnant at the time. In order to stop the assault, Riley lied and told the appellant that she was going into labor. Further, the night before the instant offense, the appellant accosted the same girlfriend after she informed him that she was permanently breaking off their relationship. The appellant pulled her out of her car, beat her, and then took her car, purse, and cell phone. Other evidence showed that the appellant shot at another person in a parking lot on May 9, 2004, but charges were never filed.

Appellant presented evidence of a tumultuous childhood. When he was eight years old, his father was murdered and his sister was molested and impregnated by his stepfather. Appellant argued that he never recovered from these events emotionally as he never received the counseling or the father figures that he needed. He became angry and withdrawn and began using drugs. However, the appellant's mother, new stepfather, aunt, and grandmother all testified to the appellant's good side and how they were all shocked and

surprised by the instant offense. The appellant had just had two children, a daughter born in June and another in September, and he was attempting to get custody of one of the girls prior to the offense. The appellant also presented evidence that he had told a psychologist that he had consumed fifteen to twenty beers and smoked marijuana the night before the instant offense, and that he smoked crack cocaine the morning of the offense. The appellant further pointed out that he committed no acts of violence or even infractions during his fourteen months of incarceration while waiting for his trial. The appellant argues that this evidence should outweigh the evidence presented by the State. While intoxication at the time of the offense and good behavior in prison are factors that a jury might consider, neither precludes a finding of future dangerousness.[26] We have held that, while this Court can review the objective evidence of future dangerousness, we do not engage in reviewing the jury's normative decision on mitigation, whether it answers in the affirmative or the negative.[27] Therefore, we defer to the jury's conclusion that the evidence was not sufficient to warrant a sentence of life imprisonment and conclude there was sufficient evidence to support the jury's affirmative finding on the future dangerousness issue. Point of error eleven is overruled.

In his third point of error, the appellant claims that the trial court erred in overruling his *Batson*[28] challenges regarding three African–American venire members: Geneva Johnson, Myrtlene Williams, and

---

26. *See Banda*, 890 S.W.2d at 50–51 (intoxication); *Emery v. State*, 881 S.W.2d 702, 707 (Tex.Crim.App.1994) (lack of violent behavior in prison).

27. *Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim.App.1995).

28. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

Paulette Childress.[29] After the appellant objected to the State's peremptory challenge of each of these venire members as racially motivated, the trial court held a *Batson* hearing in which the prosecutors testified as to their race-neutral reasons for exercising the peremptory strikes. The trial court found the State did not exercise the peremptory strikes on the basis of race and overruled each of the appellant's challenges.

In *Batson*, the Supreme Court outlined an analytical tool for testing the challenges to the State's use of peremptory strikes. Initially, the defendant must establish a *prima facie* case showing that the State exercised its peremptory challenges in a discriminatory manner. The burden then shifts to the State to articulate race-neutral explanations for its questioned strikes which the defendant may rebut. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination by the State.[30]

In the instant case, we need not address whether the appellant established a *prima facie* case. Where the prosecutor has articulated his reasons for the challenged peremptory strike and the trial court has ruled on the ultimate questions of intentional discrimination, that issue becomes moot.[31] Therefore, we shall go on to review the trial court's decisions.

We review the record of a *Batson* hearing and the voir dire examination in the light most favorable to the trial court's ruling.[32] We will not disturb a trial court's ruling on a *Batson* issue unless it is clearly erroneous.[33]

We first note that, in the instant case, six out of sixty venire members were African–American.[34] Of these six venire members, one was disqualified, one was challenged for cause by the State without objection by the defense, and three were excluded by the State's peremptory strikes. One African–American was accepted to serve on the jury and was the second juror selected overall. The State exercised a total of fourteen peremptory strikes.

Juror number 27, Geneva Johnson, was the first African–American prospective juror struck by the State. Following the defense's *Batson* challenge, the State gave the following race-neutral basis for exercising the strike:

[State]: Your Honor, in response, the prospective juror indicated on her questionnaire that the defendant appeared to be about the age of her sons, that she was not sure she could render a fair verdict. And while she believed in capital punishment, she did not think she could make that decision herself. It is based on that comment

29. *See* Art. 35.261.

30. *See Batson v. Kentucky*, 476 U.S. at 106, 106 S.Ct. 1712.

31. *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim.App.1992); *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

32. *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim.App.2004); *Cantu*, 842 S.W.2d at 689;

*Harris v. State*, 827 S.W.2d 949, 955 (Tex. Crim.App.1992).

33. *Gibson*, 144 S.W.3d at 534; *Cantu*, 842 S.W.2d at 689; *Whitsey v. State*, 796 S.W.2d 707, 726 (Tex.Crim.App.1990) (op. on reh'g).

34. Approximately 200 prospective jurors were called. However, the jury was seated after the initial sixty were questioned or otherwise disqualified.

and that comment in her questionnaire alone that—

[COURT]: Her response to question 89.[35]

[State]: That is correct. And that was the reason for the State's peremptory challenge in this case.

[COURT]: Go ahead. [To Defense]

[Defense]: Judge, I think also that we should be given the opportunity to question her further if they're going to base it solely on the questionnaire. That they had a chance to ask her to clarify that. They did. And I don't think that her response bears out what was stated in the questionnaire. The point of the questionnaire is simply to provide a road map for questioning at the time of the actual live voir dire. And she was asked to explain that. I think she gave a sufficient answer such that she's not— challenge her peremptorily on that basis.

[COURT]: It's denied.

The appellant argues the State's reasons for striking Johnson were not race-neutral. Specifically, he contends that the State displayed disparate treatment towards similarly situated non-African American venire members through a comparison of Johnson's responses to those of two Hispanic venire members, Jason Olivarri and Jaime Pena. The State accepted Olivarri as a member of the jury without any objection by the defense, while Pena was peremptorily struck by the defense. The appellant claims that the State's stated basis for striking Johnson was its concern regarding her ability to render a fair verdict, and if the State's reason was indeed race-neutral, then the State would have also struck Olivarri and Pena, whose responses should have elicited the same type of concern.

Johnson stated in Question 89 of her jury questionnaire that she was unsure whether she could render a fair verdict because the defendant reminded her of her own sons.[36] Olivarri's response also indicated that he had a reason that might cause him to not be fair, stating "I get easily nervous and could easily sway in favor of either party if they pressured me hard enough." The appellant's attempt to characterize these responses as being similar is misplaced. Johnson's statement in Question 89 regarding her uncertainty in her ability to render a fair verdict was in reference to her personal belief that she might not be able to vote in favor of the death penalty because it would be like convicting her own sons. Olivarri implied that he just might be easily swayed by jury argument. Further, regarding the death penalty, Johnson indicated she might be unable to assess the full range of punishment for the crime in which the

---

**35.** Question 89 of the Bexar County Juror Information questionnaire asked, "Do you know of a reason why you could not serve as a juror in this case and be absolutely fair to both the Defendant and the State, and render a verdict based solely upon the evidence presented to you?" Immediately following the question there was space to check "Yes" or "No", and following the question, "If yes, please explain." Two lines were provided for the prospective juror to answer the question.

**36.** In her juror questionnaire, Johnson explained her affirmative answer to Question 89 by stating "The defendant appears to be about the age of my sons. I'm not sure I would render a fair verdict. While I believe in capital punishment[,] I don't think I could make that decision myself." She elaborated on those answers during voir dire.

defendant was charged. In comparison, Olivarri told the prosecutor that he believed in an "eye for an eye," and would be in favor of the death penalty if he found the evidence supported such a verdict. Hence, the concerns raised by Johnson's and Olivarri's responses in their questionnaires and during voir dire are sufficiently dissimilar so as to dispel any inference of disparate treatment by the State.

The appellant also compares the State's concerns regarding Johnson's inability to render a fair verdict to Jaime Pena's possible prejudices against the State as a result of his prior false arrest. The State argues it was more likely the defense would find Pena to be a greater risk based on Pena's business connections to the victim's family. The State did not need to waste a peremptory strike on Pena knowing the defense would exercise one. Thus, the appellant's argument that the State displayed disparate treatment of venire member Pena as compared with Johnson is not borne out by the record.

 Juror number 38, Myrtlene Williams, was the second African–American prospective juror struck by the State. In response to the defense's *Batson* challenge, the State offered the following explanation for striking Williams:

> [State]: Our position, Judge, is she participates in what's called the Outreach Ministries, and the group that she participates with goes into the prison for the sole purpose of rehabilitating people within the jail and the prison system. And that's our main reason. And then in addition that, she has a daughter who has, that she had men-

tioned, been convicted of a larceny type offense in the State of North Carolina.

\* \* \*

> [Defense]: Mr. Bunk, is there, in any response from Ms. Williams, to you, that indicate that she cannot be fair or impartial and listen to the evidence presented in this case?

> [State]: I didn't ask her that question, sir.

> [Defense]: Exactly. Is there, in any response from Ms. Williams, that she would not fairly or impartially answer the special issue questions concerning life or death?

> [State]: No. I chose to strike her because of her membership with Outreach Ministry, and her daughter's— specifically her daughter's criminal history.

Discriminatory intent is not inherently present in the State's proffered race-neutral explanation.[37] In his attempt to rebut the State's reasons for striking Williams, the appellant merely asserts other areas in which the State may have inquired, such as the juror's ability to consider the full range of punishment, the same inquiry that the State based its strike of prospective juror Johnson. However, the State did not have to further examine Williams regarding her opinion of the death penalty if it had already decided that the juror's membership in the Outreach Ministries, in addition to her daughter's criminal history, would make her undesirable as a member of the jury. Nevertheless, the appellant now argues on appeal that the State's

---

**37.** *See Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)(*per cu-* *riam*).

race-neutral reasons were pretextual because the State misconstrued Williams' role in the Outreach Ministries and displayed disparate treatment with regard to other non-African American jury members who also had personal criminal histories or close relatives with criminal histories.

The appellant argues that the prosecutor, in an effort to keep an African–American off the jury, mischaracterized Williams' words to make it seem as though Williams personally ministered to inmates for the sole purpose of rehabilitating them. Williams advised the prosecutor during her voir dire examination that she was a member of Outreach Ministries. However, she stated that her involvement in the group was focused on helping the homeless and families in poverty in an effort to "bring them closer to the Church." When Williams told the prosecutor that there were members of her group that attended the jails and prisons, the prosecutor asked Williams what the purpose of such visits was, to which she agreed that the purpose was to attempt to rehabilitate inmates.

█ An examination of the exchange makes it apparent that the State did not intentionally misconstrue Williams' words in its explanation of its strike. The State's main basis for excluding Williams from the jury—that "*the group* that she participates with goes into the prison for the sole purpose of rehabilitating people"—is consistent with Williams' voir dire account of *those particular members'* goal in its ministry. It was not improper for the State to strike Williams based on her connection to

Outreach Ministries if it felt her membership could cause her to be more sympathetic to the defendant, particularly in the punishment phase of trial.[38] Furthermore, whether the prosecutor was accurate in his assertion that it was the Outreach Ministry members' *sole* purpose in going to the prison to rehabilitate the prisoners, is inconsequential. The trial court is not required to find a *Batson* violation simply because the proffered explanation turns out to be incorrect.[39] Hence, the appellant's contention of pretext based upon an alleged mis-characterization of William's response is insufficient to rebut the prosecutor's race-neutral explanations.

The appellant also claims that four non-African American jury members, as well as five other non-African American venire members who were either struck or successfully challenged by the appellant, received disparate treatment from Williams during the State's voir dire examinations. The State, however, did not engage in disparate treatment with regard to questioning venire members because none of these other prospective jurors put their honesty in question. In contrast, Williams put her veracity at issue when she failed to disclose her daughter's larceny conviction in her jury questionnaire. When asked in Question 71 if she knew of any "close friend or relative that has been charged, arrested, indicted or convicted of any criminal offense above the level of a traffic violation," Williams checked the box marked "No." In response to the State's voir dire question about her daughter's

---

38. *See Casarez v. State*, 913 S.W.2d 468, 496 (Tex.Crim.App.1995) (stating that "in the case of religion, the attribution is not overly broad, and therefore not invidious, when the belief is an article of faith[; b]ecause all members of the group share the same faith by definition,

it is not unjust to attribute beliefs characteristic of the faith to all of them").

39. *Gibson*, 144 S.W.3d at 534 n. 5 (citing *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim.App.2002); *Ford v. State*, 1 S.W.3d 691, 693–94 (Tex.Crim.App.1999)).

"difficulties in North Carolina," Williams indicated to the prosecutor that she became aware of her daughter's larceny conviction "two or three years ago." In comparison, none of the four non-African-American venire persons who eventually served on the jury, nor the five venire persons excluded by the defense, failed to disclose the criminal history of themselves, close relatives, or friends. Nevertheless, this court will not impute disparate treatment in every instance where one of the State's reasons for striking a juror might technically apply to another venire member whom the State found acceptable.[40] The concealment of her daughter's larceny conviction, along with Williams' affiliation to a group that ministers to prisoners, provided reasonable grounds for concern to the State to warrant its exercise of a non-race based peremptory strike.

■ Paulette Bell, juror number 57, was the third African–American venire member peremptorily struck by the State. In response to the appellant's *Batson* challenge, the State testified to the following reasons for its peremptory strike of Bell:

[State]: The State struck this juror for a multitude of reasons. Once, she—her husband and son, both [b]lack men, feel like they were—pulled over and apparently more than one time [in] her son's case, and felt like they were victims of racial profiling. Second reason, she was on a criminal jury and found the defendant—has been on a criminal [jury] that reached a not guilty verdict. [Third] she also spoke that she'd like the chance to go to the jail, and minister and preach. [Fourth] she, uh, while she indicated

today that she would be able to be—consider the death penalty, she strongly opposed it in her questionnaire, and repeats more than once, under no circumstances could she participate in that.

[Defense]: And Judge, for the record, she's a black female. Judge, their primary reason offered is not a race-neutral reason. He stated specifically that her husband and son are black males, and that consequently they choose to strike her from this case because they supposedly had been the subject of racial profiling. That is not a race-neutral reason.

[COURT]: Yeah, but the other ones are.

[Defense]: Well, they listed as their primary reason—

[State]: I did not.

[COURT]: They listed it as the first reason.

[Defense]: Okay. I'd ask that she be impaneled on that basis, because they have not provided race-neutral reasons for striking this juror.

[COURT]: Okay, that's denied. I mean, it's denied.

The appellant argues that the State's first reason for striking Bell was not race-neutral and, in the alternative, the State's explanation for its challenge falls within the "mixed motives" doctrine and the case should, therefore, be remanded.[41] In *Guzman*, the State offered reasons for its peremptory strike that were both gender based and gender neutral. However, in ruling on the *Batson* challenge, the trial court failed to make explicit findings that

---

**40.** *See Adanandus v. State,* 866 S.W.2d 210, 224–25 (Tex.Crim.App.1993).

**41.** *See Guzman v. State,* 85 S.W.3d 242 (Tex. Crim.App.2002).

the State's strike could be based upon the neutral reasons alone, and therefore, the case was remanded to the trial court to make findings on that issue.

Here, the appellant contends that the prosecutor's pointing out that Bell's husband and son were "black men" and subjects of "racial profiling" is an indication the State had a racially discriminatory motive for striking Bell. However, the prosecutor's statement that the juror's family members were black was made to explain its decision to strike Bell based on her close familial relationship to persons who believed they experienced racial profiling. The State's striking of a juror based on her personal or close relative's experiences with or perceptions of law enforcement, particularly one as negative as racial profiling, is not by itself determinative of racial discrimination.[42] Thus, the appellant did not rebut the State's race-neutral reason for striking Bell based on the prosecutor's mere mentioning of the race of the juror's family members, or its stated concern regarding her family members' previous experiences with racial profiling.

Even assuming *arguendo* that the State displayed a discriminatory motive in its first basis for striking Bell and the "mixed motives" doctrine applies, such grounds do not raise equal protection concerns to a level that would require remanding this case to the trial court as was done in *Guzman*, and as is now requested by the appellant.[43] Unlike in *Guzman*, the State and the trial judge here both noted that

the first reason proffered by the State was *not* the primary reason, but rather the *first* of four reasons the State sought to exclude Bell. In addition, the trial judge demonstrated his consideration of the State's other three reasons by responding to the appellant's contention that the State's first reason was not race-neutral by saying "Yeah, but the other ones are." Lastly, the facts in this case contrast with *Guzman* because the trial judge explicitly denied the appellant's charge of purposeful racial discrimination by the prosecutor.[44] After reviewing the evidence in a light most favorable to the trial court's ruling, we are able to discern from the present record what the trial court determined concerning the State's allegedly race-based peremptory strike of prospective juror Bell. Therefore, the trial court did not err in overruling the appellant's *Batson* challenges and a remand is not necessary. Point of error three is overruled.

◼ In points of error four, five, and six, the appellant alleges that the trial court erred in denying his motion to suppress any statements made or evidence seized following his arrest because he was arrested without a warrant in violation of Article 38.23 and Chapter 14 of the Texas Code of Criminal Procedure, the Fourth and Fourteenth Amendments to the United States Constitution, and Article I § 9, of the Texas Constitution.

At trial, the appellant raised these claims in a general "Motion to Suppress." The motion merely states that he was ar-

---

42. *See Williams v. State*, 804 S.W.2d 95, 98 (Tex.Crim.App.1991) (stating the prosecutor's strategy of selecting jurors not prone to have a prejudice against either the police officers or the State was race-neutral); *see also Hawkins v. State*, 793 S.W.2d 291, 293–94 (Tex. App.-Dallas 1990, pet. ref'd) (holding that a prosecutor's statement that a juror had a pri-

or unpleasant experience with law-enforcement personnel is a race-neutral explanation).

43. *See Guzman*, 85 S.W.3d at 255.

44. *Compare Guzman*, 85 S.W.3d at 254–55.

rested without "a valid warrant or probable cause or reasonable suspicion." He further claims that any and all statements made after the arrest are "fruit of the poisonous tree." No further argument or citations were made in the motion, at the pre-trial hearing, or at trial.

At the hearing on the motion to suppress, the only evidence presented regarding the appellant's arrest came during the cross-examination of the State's witness, Officer Richard Hodge. The defense asked the officer how he came in contact with the appellant. Hodge answered that they were looking for a vehicle that was used in the robbery-murder, that the car was found parked at a house, the occupants of the house were ordered out, the appellant was uncooperative, and he was arrested. Hodge advised the appellant of his rights and explained to him why he was being arrested. The remainder of the questioning revolved around whether the appellant was intoxicated and how certain items of clothing and other evidence were obtained. No other evidence was presented, and no argument was made regarding an arrest, illegal or otherwise. Rather, the hearing focused on the alleged warrantless seizure of specific items of evidence. At the end of the presentation of witnesses, the State specifically requested a ruling on "the admissibility of the clothes taken from the Defendant." The defense agreed. The judge stated: "Yeah. As far as the boxers, the socks and the rape kit, stuff that's in the rape kit, it's all admissible—well, I don't know if it's admissible—well, your Motion to Suppress is denied, let's put it that way." The defense then requested that the trial court reserve its ruling on the Motion to Suppress with regard to the buccal swabs, a pair of shorts, and a t-shirt as the predicate had not been established yet. No express ruling was ever made regarding the warrantless arrest claim nor did the appellant request a ruling at any time.

■ When a defendant seeks to suppress evidence on the basis of an illegal arrest, the initial burden of proof is placed on the defendant to rebut the presumption of proper conduct.[45] The defendant may satisfy this burden by establishing that he was arrested without a warrant.[46] Once this is shown, the burden shifts to the State to either produce evidence of a warrant or prove the reasonableness of the arrest.[47]

Here, the appellant failed to offer evidence that the arrest was warrantless. He could have done so easily by asking Officer Hodge if the arrest was made pursuant to a warrant. The appellant, however, failed to do so. Therefore, we must presume proper conduct, and the burden never shifted to the State to produce evidence of a warrant or, alternatively, to prove the reasonableness of the arrest. Assuming *arguendo* that the trial court ruled upon the appellant's warrantless-arrest claim, we presume he did so based upon the foregoing law. The trial court did not err. Points of error four, five and six are overruled.

In the appellant's seventh point of error, he posits that the trial court erred in denying his Motion to Suppress because his slippers and socks were illegally seized from him without a warrant, in violation of

**45.** *McGee v. State,* 105 S.W.3d 609, 613 (Tex. Crim.App.2003); *Russell v. State,* 717 S.W.2d 7, 9 (Tex.Crim.App.1986).

**46.** *Id.*

**47.** *Id.*

the Fourth and Fourteenth Amendments to the United States Constitution. As stated in the previous three points of error, the appellant made only a general statement in his written motion that "the seizure of items, papers and effects from him was effected without valid warrant or probable cause or reasonable suspicion" in violation of the state and federal laws. The appellant did not set out what specific evidence he wanted suppressed or brief his argument at trial in any way.

At the suppression hearing, evidence was elicited that the appellant's socks and slippers were seized from him after his arrest. The appellant was taken to Methodist Specialty Hospital to have a rape kit completed for the sexual assault that preceded the instant offense. Officer Hodge testified that he took the appellant's slippers after the appellant removed them for the exam by the Sexual Assault Nurse Examiner (SANE). The socks were secured by the SANE nurse who then gave them to Officer Hodge. Evidence was further elicited as to how the evidence was secured, tagged, and preserved for testing. Neither the State nor the defense, prior to the trial court expressly denying the Motion to Suppress, made any argument with regard to the items collected at the time of the sexual-assault exam.[48]

Again, the appellant had the burden to show that the items in question were seized without a warrant.[49] And, again, the appellant failed to establish that there was no warrant. However, unlike the claim regarding the alleged warrantless arrest, evidence was elicited regarding the seizure of the items. Assuming *arguendo* that the appellant preserved his argument on appeal, we hold that it is without merit.

If the trial court's ruling regarding a motion to suppress is reasonably supported by the record and is correct under any theory of law applicable to the case, the reviewing court must affirm.[50] Here, while there is no evidence that the appellant consented to the seizure of his socks or slippers, the evidence does show they were taken pursuant to a lawful custodial arrest.[51] The warrantless seizure of a suspect's clothing subsequent to a legal arrest, while he is in custody or detention, is permissible.[52] "Indeed, it is difficult to

---

**48.** Both the appellant and the State submit that the trial court did not expressly rule upon this evidence. After a careful review of the record, we disagree. The trial court ruled specifically on the rape kit, boxers, socks, and slippers. The judge then stated, "The buccal swab, that kind of goes with everything else. I guess, if its—" The State then interrupted and stated that the shorts, swab, and t-shirt were collected at the police station. The defense then requested that the trial court reserve his ruling as to the shorts and t-shirt as they were "not in complete predicate yet." At no time did the trial court withdraw his ruling regarding the socks and slippers.

**49.** *See McGee*, 105 S.W.3d at 613.

**50.** *Romero v. State*, 800 S.W.2d 539, 543–44 (Tex.Crim.App.1990).

**51.** The appellant failed to successfully challenge the legality of his arrest. *See* points of error four five, and six, *supra*. Further, after a thorough review of the record at trial, we hold that there was sufficient probable cause and reasonable suspicion to arrest the appellant without a warrant, assuming there was not one, in accordance with both state and federal laws.

**52.** *See U.S. v. Edwards*, 415 U.S. 800, 805–09, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974) (defendant's clothing seized the morning after his arrest, when it became apparent clothes might be evidence of crime); *Marquez v. State*, 725 S.W.2d 217, 234 (Tex.Crim.App. 1987).

perceive what is unreasonable about the police examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest." [53] Point of error seven is overruled.

■ In points of error eight and nine, the appellant complains that the trial court erred in admitting into evidence State's Exhibit 10, an autopsy identification photograph of the victim, at the guilt phase of trial. Specifically, he alleges that the prejudicial nature of the photograph substantially outweighed its probative value and that it was needlessly cumulative.[54]

■ When determining whether the trial court erred in admitting relevant photographs into evidence, our review is limited to determining whether the probative value of the photos is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence.[55] The trial court's decision is reviewed under an abuse of discretion standard, and may be disturbed on appeal only when the trial court's decision falls outside the zone of reasonable disagreement.[56]

■ A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include: the number of ex-hibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked.[57] A court, however, should not be limited by this list. The availability of other means of proof and the circumstances unique to each individual case should also be considered.[58] In reviewing the complained-of photograph, we note initially that it is in color and is 8½" × 11" in size.

Our review shows that State's Exhibit 10 is an autopsy identification photo of the victim. The victim is shown unclothed from the chest up, lying on a table. The medical examiner's placard showing the case number is placed across the victim's chest. The placard covers up most of the chest and most of the entry gunshot wound. The photo was used twice by the State during the guilt phase. The State's first witness, Mitesh Patel, the victim's son, was shown the photo to identify that his father was the victim in this case. The defense did not object when the photo was displayed for identification purposes. The photo was not admitted into evidence at that time. The next time the photo was displayed was during the medical examiner's testimony. The medical examiner, Dr. Jennifer Rulon, early in her testimony, testified that each autopsy exam is assigned a specific case number that goes on her autopsy report and any other reports. At the end of her direct testimony, Dr. Rulon explained how she always takes an

---

53. *Edwards,* 415 U.S. at 806, 94 S.Ct. 1234 (citations omitted).

54. Tex R. Evid. 403.

55. Tex.R. Evid. 403; *Long v. State,* 823 S.W.2d 259, 271 (Tex.Crim.App.1991), citing *Montgomery v. State,* 810 S.W.2d 372, 389 (Tex. Crim.App.1991) (op. on reh'g).

56. *Montgomery,* 810 S.W.2d at 391.

57. *Long,* 823 S.W.2d at 272.

58. *Id.*

identification photo of the deceased with a placard that has the case number on it. The State then asked if Exhibit 10 shows that "this is the individual who you've been discussing having done the autopsy on?" Dr. Rulon replied, "Yes." The photo was admitted over the appellant's objection.

The admissibility of a photograph is within the sound discretion of the trial judge.[59] A photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible.[60] State's Exhibit 10 is an autopsy identification photo. It depicts the victim before autopsy and displays the autopsy number assigned to that victim. A photo of the victim displaying the autopsy number ensures that the autopsy report will correspond to the photo of the correct victim. Thus, even though the victim's identification was initially based on his son's testimony, the medical examiner's office still utilized the photo for the purpose of tying the victim to his assigned case number. For this reason, the autopsy identification photo was relevant and not cumulative of the autopsy photographs exhibiting the wounds. Regarding the appellant's claim under Texas Rule of Evidence 403, we cannot say that the trial court abused its discretion in holding that the probative value of the photograph outweighed the danger of unfair prejudice. The complained-of picture is not particu-larly gruesome or detailed, it is not enhanced in any way, and it portrays no more than the condition of the victim due to the injuries inflicted. Therefore, we overrule points of error eight and nine.

 In point of error ten, the appellant complains that the trial court erred when it denied his request for a jury charge on the lesser-included offense of murder. Specifically, he argues that, because a police officer testified that he thought the audio on the store's surveillance video was "unintelligible," there is no evidence that he committed murder in the course of robbing or attempting to rob Patel. Alternatively, he argues that, because at the beginning of the surveillance video the appellant asks how much dry cleaning costs, there is evidence that he did not intend to rob Patel.

 In determining whether the appellant is entitled to a charge on a lesser-included offense, we must consider all of the evidence introduced at trial, whether produced by the State or the defendant.[61] This Court uses a two-pronged test in its review.[62] First, the lesser-included offense must be included within the proof necessary to establish the offense charged; second, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser-included offense.[63] The credibility of the evidence and wheth-

---

**59.** *Paredes v. State*, 129 S.W.3d 530, 539–40 (Tex.Crim.App.2004); *Williams v. State*, 958 S.W.2d 186, 195 (Tex.Crim.App.1997).

**60.** *Id.* at 540.

**61.** *Goodwin v. State*, 799 S.W.2d 719, 740 (Tex.Crim.App.1990).

**62.** *Rousseau v. State*, 855 S.W.2d 666, 672–75 (Tex.Crim.App.1993); *Goodwin*, 799 S.W.2d at 740–41.

**63.** *See Hall v. State*, 225 S.W.3d 524, 536 (Tex.Crim.App.2007), *quoting Bignall v. State*, 887 S.W.2d 21, 23 (Tex.Crim.App.1994) ("A defendant is entitled to an instruction on a lesser-included offense where the proof for the offense charged includes the proof necessary to establish the lesser-included offense and there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense.").

er it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given.[64]

This Court has long held that murder is a lesser-included offense of capital murder.[65] Therefore, the appellant has met the first prong of the test. However, the appellant fails to meet the second prong. First, we point out that the appellant contradicts himself in his argument. He states that the surveillance audio is completely unintelligible, but then admits that he can discern what is being said at the beginning of the tape. We note that this Court has listened to the tape and is able to discern the statements made by the appellant. However, even assuming the police officer was correct and the audio was unintelligible, there is no evidence that the appellant is guilty of only the lesser-included offense of murder. In viewing the surveillance video with no sound, we observe that the video shows the appellant entering the store, drawing a weapon, forcing Patel to the register at gunpoint, shooting Patel, going to the register, and then leaving the store.

Given these facts, we conclude that there is no evidence in the record from which a rational trier of fact could determine that the appellant was guilty only of murder. The trial judge did not err in refusing the instruction. Point of error ten is overruled.

■ In his twelfth and thirteenth points of error, the appellant claims that the trial court erred when it overruled his objection and permitted the admission of evidence at punishment regarding an extraneous shooting incident. Specifically, the appellant complains that the evidence was not relevant to the punishment issues and that the probative value of the evidence was substantially outweighed by its prejudicial effect. He argues that the evidence was not relevant because the State did not "clearly prove" that he committed the extraneous offense.

■ Generally, evidence of extraneous acts involving a defendant is relevant and admissible in the punishment stage of a capital case.[66] Further, Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial.[67] However, before a trial court may admit evidence of uncharged misconduct (also known as "extraneous offenses" or "extraneous misconduct"), the State must "clearly prove" that the misconduct occurred and that the defendant was the perpetrator.[68] It is enough that the State presents evidence that, if believed, establishes that the defendant himself committed the extraneous misconduct.[69]

The evidence here showed that on May 9, 2004, the appellant was living with Chala Riley. Riley testified that she was sitting with the appellant on the front porch of their home when an individual known as "C–Small" drove by. The appellant got

64. *Banda*, 890 S.W.2d at 60.

65. *See Feldman v. State*, 71 S.W.3d 738, 750 (Tex.Crim.App.2002); *Thomas v. State*, 701 S.W.2d 653, 656 (Tex.Crim.App.1985).

66. *See McFarland v. State*, 928 S.W.2d 482, 512 (Tex.Crim.App.1996); *Patrick v. State*, 906 S.W.2d 481, 494 (Tex.Crim.App.1995).

67. *Williams v. State*, 958 S.W.2d 186, 196 (Tex.Crim.App.1997); *Montgomery*, 810 S.W.2d at 389.

68. *Chamberlain v. State*, 998 S.W.2d 230, 235 (Tex.Crim.App.1999).

69. *Harris*, 827 S.W.2d at 961.

"all hyped up." She heard the appellant say "I'm going to go get C–Smalls. I'm going to shoot C–Small." The appellant then left the house with his older brother, who had been inside. Shortly thereafter, Riley heard five or more gunshots not far from the house. She testified that the appellant later told her that "he had shot at C–Smalls."

Officer Joseph Briseno testified that he was called to the scene of a shooting at an apartment complex that was next to the appellant's house. When he arrived, he noticed two suspects fleeing the location. The appellant was one of the suspects. As Briseno approached the appellant, the appellant reached into his waistband and threw a gun into the bushes. Briseno recovered the weapon which was fully loaded. Briseno testified that the appellant told him that he got the gun in self-defense and that he and "C–Small" were shooting at each other. Shell casings were recovered from the parking lot and were found to have come from the appellant's gun. The appellant also had gunshot residue on his hands.

■ We hold that the appellant's out-of-court admissions that he committed the act of misconduct, along with his possession of the weapon and forensic evidence, constituted "clear proof" that he committed the extraneous offense. We conclude that the trial court did not err in holding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Rule of Evidence 403.

We note that all evidence connecting a defendant with a particular crime is highly

prejudicial. However, here the evidence of the extraneous shooting was clearly probative of whether the appellant would be a future danger. It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 bars its admission.[70] In reviewing the record before us, we cannot say that the probative value of the extraneous shooting was substantially outweighed by the danger of unfair prejudice. Points of error twelve and thirteen are overruled.

■ In point of error fourteen, the appellant alleges that the trial court erred when it denied his motion for mistrial at punishment. He argues that Officer Briseno's spontaneous statement that the weapon used by the appellant in the May 2004 shooting was a "stolen firearm" caused him incurable prejudice. With respect to this point of error, the record reflects that Officer Briseno testified that he witnessed the appellant throw a gun into the bushes; the officer further testified that he was the one who recovered the weapon. On re-direct examination, the following occurred:

[State]: Officer, what type of gun was it?

[Briseno]: It's a semi-automatic handgun. It was a Republic Arms, Patriot .45 caliber, silver and black .45 caliber; one in the chamber and six in the clip. And it was also a stolen firearm.

[Defense]: Judge, I'm going to object.

[COURT]: Sustained. Ladies and Gentlemen of the jury, step outside.

The court then reprimanded the officer for providing the additional information that

---

**70.** *Jones v. State,* 944 S.W.2d 642, 652 (Tex. Crim.App.1996); *Joiner v. State,* 825 S.W.2d 701, 708 (Tex.Crim.App.1992).

the gun was stolen. Defense counsel requested an instruction to disregard and moved for a mistrial. The motion for mistrial was denied, but the court did instruct the jury upon their return to "disregard the last question and answer by this witness in every form and fashion."

 A witness's inadvertent reference to an extraneous offense is generally cured by a prompt instruction to disregard.[71] A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile.[72] Therefore, a mistrial should be granted only in cases where the "reference was clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be impossible to remove the harmful impression from the jurors' minds."[73]

We discern no abuse of discretion in the trial court's denial of a mistrial. The testimony in issue did not actually assert that the appellant stole the weapon or that he knew it was stolen. The trial court could have reasonably concluded that the answer was not so inflammatory as to be incurable by an instruction to disregard. Point of error fourteen is overruled.

 Finally, in the appellant's fifteenth point of error, he complains that the trial court, when instructing the jury regarding the mitigation special issue, failed to give the instruction contained in Article 37.071, § 2(f)(3). He argues that this violated his

rights under both the Eighth and Fourteenth Amendments to the United States Constitution.

At punishment, the trial court instructed the jury:

> The second issue is:
>
> State whether, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Jurors were not instructed that they "need not agree on what particular evidence supports an affirmative finding on the issue."[74]

The appellant argues that the charge robbed him of the safeguard of having jurors made unambiguously aware that they did not need to agree on the particular evidence that supported a "yes" answer to the mitigation issue. The appellant further argues that the instruction skewed the jury's understanding in the prosecution's favor, and therefore, he was denied the constitutional guarantee of jury unanimity.

The appellant did not object to the charge, but now contends that the lack of the instruction egregiously harmed him under the standard set out in *Almanza v. State*.[75] The appellant relies on *Mills v.*

71. *Rojas v. State*, 986 S.W.2d 241, 251 (Tex. Crim.App.1998); *Kipp v. State*, 876 S.W.2d 330, 339 (Tex.Crim.App.1994).

72. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim.App.1999).

73. *Rojas*, 986 S.W.2d at 250.

74. Art. 37.071, § 2(f)(3).

75. 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g).

*Maryland*[76] to support his argument that the lack of the Article 37.071, § 2(f)(3), instruction requires reversal. The charge in *Mills* listed the statutorily available mitigating circumstances in that case and directed jurors to unanimously affirm whether they agreed or disagreed that each circumstance did or did not exist.[77] The United States Supreme Court found that such a charge improperly required that all jurors unanimously agree on the mitigating circumstances before finding that those circumstances warranted a life sentence.[78] However, even when presented with the circumstances in *Mills,* the Supreme Court did not go so far as to say it is a constitutional requirement that every jury deliberating punishment in a capital case should be explicitly instructed that the jurors need not agree on the particular mitigating circumstances.

In this case, while jurors were not given the statutorily required instruction that they need not agree on the particular mitigating evidence, they unanimously found that no sufficient mitigating circumstance or circumstances warranted that a life sentence be imposed. The foreman signed the answer that stated: "We, the jury, unanimously find and determine that the answer to this Special Issue is 'No.'" Because no juror believed there was a circumstance or circumstances that warranted a life sentence, there was no possibility that the jurors would be confused about a need to agree on a particular circumstance or circumstances.

Although the trial court erred in failing to give the statutory instruction, in this case, the appellant was not deprived of the constitutional guarantee of a unanimous verdict and did not suffer egregious harm. Nor was the appellant denied a fair trial. Point of error fifteen is overruled.

We affirm the judgment of the trial court.

COCHRAN, J., filed a concurring opinion.

PRICE, J., filed a dissenting opinion.

KEASLER, J., concurred in the result with respect to point of error fifteen and otherwise joined the opinion.

HERVEY, J., did not participate.

## OPINION

COCHRAN, J., concurring.

I join in the Court's resolution of appellant's fifteenth point of error concerning the punishment charge. Although the trial judge accidentally omitted a portion of the statutory language related to the mitigation issue, this record does not support a finding that appellant "has suffered actual, rather than merely theoretical, harm from jury instruction error."[1] Furthermore, because appellant explicitly stated that he had "no objection" to the jury charge, he cannot obtain a reversal of his conviction unless the trial record shows that he suffered "egregious" harm because of that missing instruction. Thus, we must affirm unless the record shows that appellant was denied the right to have each juror consid-

**76.** 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

**77.** *Id.* at 378, 108 S.Ct. 1860.

**78.** *Id.* at 384, 108 S.Ct. 1860.

**1.** *Warner v. State,* 245 S.W.3d 458, 464 (Tex. Crim.App.2008) (quoting *Ngo v. State,* 175 S.W.3d 738, 750 (Tex.Crim.App.2005)).

er different mitigating evidence in reaching a unanimous verdict that no mitigating circumstance or combination of circumstances called for a life sentence rather than one of death.[2]

Although appellant raises the possibility of theoretical harm, the "possibility" or "conceivability" of harm is not the "actuality" of egregious harm.[3] This is a high and difficult standard which must be borne out by the trial record.[4] The present record demonstrates that it is most unlikely that these jurors were misled or confused by the trial court's failure to include the instruction that they "need not agree on what particular evidence supports an affirmative finding" on the mitigation issue.

When deciding that a defendant has suffered "egregious" harm because of a faulty or missing jury instruction, we have generally found such harm in only two situations:

1) The error is so plain and so obviously detrimental to the defendant and his right to a fair trial, that an objectively reasonable person would agree that such an error, by itself, deprives the defendant of a fair trial;[5] or

2) The error was compounded by other mistakes or missteps by the trial judge, prosecutor, or defense that magnified the instructional error.[6]

Neither the State nor the defendant carries a burden of persuasion on the question

2. See Ngo v. State, 175 S.W.3d 738, 752 (Tex. Crim.App.2005).

3. See Almanza v. State, 686 S.W.2d 157, 171 (Tex.Crim.App.1984).

4. See Ellison v. State, 86 S.W.3d 226, 227 (Tex.Crim.App.2002).

5. See Almanza, 686 S.W.2d at 171 (discussing history of "blatant error fundamental in nature"). We have very rarely found instructional errors of that enormity. For example, "[i]f there is a total omission of the instruction on reasonable doubt, such error defies meaningful analysis by harmless-error standards. However, if the jury is given a partial or substantially correct charge on reasonable doubt, then any error therein is subject to" a harm analysis, which would occur under the Almanza standards. State v. Toney, 979 S.W.2d 642, 644–45 (Tex.Crim.App.1998); compare Harris v. State, 522 S.W.2d 199, 202 (Tex.Crim.App.1975) (fundamental error when jury charge had no application paragraph at all; "Fundamental error is presented where error in the charge goes to the very basis of the case so that the charge fails to state and apply the law under which the accused is prosecuted."). Most "obvious" or even "fundamental" errors are found not to cause "egregious harm." See, e.g., DeBlanc v. State, 799 S.W.2d 701, 710–11 (Tex.Crim.App. 1990) (failure to instruct jury that witness was an accomplice as a matter of law did not

cause "egregious" harm because only an "unreasonable jury" would conclude that witness was not an accomplice). As the Supreme Court has recently reiterated, even a jury instruction " 'that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " Washington v. Recuenco, 548 U.S. 212, 219, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) (quoting Neder v. United States, 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).

6. See, e.g., Ngo, 175 S.W.3d at 750–52 (omission of unanimity instruction caused egregious harm when prosecutor and judge both misstated law concerning unanimity on multiple occasions during trial); see also id. 175 S.W.3d at 753 (Womack, J., concurring) ("The charge in this case also was surrounded by errors, as the court's opinion points out: the prosecutor's incorrect statement in voir dire that the law does not require a unanimous verdict, the trial court's making a statement to the same effect in voir dire, and the prosecutor's reiteration of the wrong law in argument"; thus, "by failing to cure the cumulative effect of a series of missteps, the courts' charges contained the ultimate step that make 'it appear[ ] from the record that the defendant has not had a fair an impartial trial' within the meaning of Article 36.19.").

of harm.[7] As noted by Professors Dix and Dawson, "an appellate court finding fundamental error in the charge under *Almanza* should affirm unless it can say—possibly "with confidence"—that the error resulted in harm."[8] And not just harm, but "egregious" harm when, as in this case, the appellant did not object to the jury charge.

In analyzing the record for "egregious harm," we consider the following four factors:

(1) the charge itself;

(2) the state of the evidence including contested issues and the weight of the probative evidence;

(3) arguments of counsel; and

(4) any other relevant information revealed by the record of the trial as a whole.[9]

### 1. The Jury Charge.

First, we look at the charge itself. In this case, the punishment charge omitted one sentence of a state law instruction to the jury in a capital sentencing hearing.[10] That omitted sentence was: "The jury need not agree on what particular evidence supports an affirmative finding on the mitigation issue."[11] Appellant relies upon *Mills v. Maryland,*[12] in which the Supreme

Court overturned a death sentence because of jury instructions that created a substantial probability that jurors thought they were precluded from considering any mitigating evidence unless they unanimously agreed on the existence of one or more particular mitigating circumstances. In *Mills,* the jury was instructed to first unanimously determine whether certain specific aggravating and mitigating factors existed, marking "yes" or "no" beside each listed factor, and then to weigh those specific factors in determining whether to assess death. The Supreme Court found a substantial probability that jurors would believe that they were prohibited from considering any mitigating factors unless all twelve jurors agreed on the existence on the same specific factors. That erroneous belief would result in a virtually automatic death sentence even where the jurors may otherwise have concluded that death was inappropriate.[13]

The situation is very different here. These instructions did not tell the jurors that they must agree on any specific mitigating facts. Indeed, before *Mills* was decided, the statutorily mandated jury instructions under article 37.071 did not include any instruction concerning agreement or disagreement about specific mitigating circumstances.[14] Nonetheless, this Court held that jury instruc-

---

7. *Warner,* 245 S.W.3d at 464.

8. 43A GEORGE E. DIX & ROBERT O. DAWSON, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE, § 42.241 at 365 (2d ed.2001).

9. *Olivas v. State,* 202 S.W.3d 137, 144 (Tex. Crim.App.2006).

10. See TEX CODE CRIM. PROC. art. 37.071, § 2(f) ("The court shall charge the jury that in answering the [mitigation] issue submitted under subsection (e) of this article, the jury: . . . (3) need not agree on what particular evidence supports an affirmative finding on the issue;").

11. *Id.*

12. 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

13. *Id.* at 373–74, 108 S.Ct. 1860.

14. *See Hughes v. State,* 897 S.W.2d 285, 300–01 & n. 21 (Tex.Crim.App.1994) (noting that the interpretive commentary to the legislative changes to art. 37.071(2)(d)(3), (2)(f)(3), were made in 1991 to "foreclose the potential for challenges" based on *Mills,* but stating that the statute prior to the revision did not violate *Mills* ).

tions given under former article 37.071—without any instructions that the jury need not agree on specific mitigation facts—did not violate *Mills*.[15] The addition of this statutory instruction was a prophylactic measure to avert any potential appellate challenges, not to repair an otherwise unconstitutional or ambiguous special issue.[16] If it was not error to omit such an instruction before the legislative amendment, the omission of such an instruction after the legislative amendment did not suddenly cause "egregious harm." It may be statutory error, but it is not necessarily harmful.

In this case, for example, the jurors were instructed that, before they could answer "no" to the mitigation question, each and every one of them had to agree that there were no mitigating facts or circumstances that called for a sentence of life imprisonment rather than death. If even one juror believed that there was some mitigating fact, *any* mitigating fact, that called for a life sentence, that juror could not join a verdict in which the jury "unanimously found" that there was no mitigating circumstance.[17] Appellant's jury did return a unanimous verdict that there was no such mitigating circumstance. Therefore, it would be illogical to speculate that perhaps one or more of those jurors did find a mitigating circumstance but was so confused about the unanimity requirement that he thought that unless every juror agreed upon the same mitigating fact, his vote did not count. So he changed his vote. Such reasoning assumes that jurors would violate their oaths. We must, however, "presume[ ] that jurors, conscious of the gravity of their tasks, attend closely the particular language of the trial court's instructions in criminal cases and strive to understand, make sense of, and follow the instructions given them."[18]

Other states have, like Texas, held that the omission of a "nonunanimity" instruction does not confuse or mislead the jury in a death penalty trial.[19] For example, in

15. *Rousseau v. State*, 855 S.W.2d 666, 687 n. 26 (Tex.Crim.App.1993) (rejecting defendant's claim that former art. 37.071 misled jurors by creating impression that jury must be unanimous in finding the existence of specific mitigating circumstances).

16. *Hughes*, 897 S.W.2d at 300–01.

17. Tex.Code Crim. Proc. art. 37.071, § 3(e)(1), (f)(2).

18. *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *see also Parker v. Randolph*, 442 U.S. 62, 75 n. 7, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) ("The 'rule'—indeed, the premise upon which the system of jury trials function under the American judicial system—is that juries can be trusted to follow the trial court's instructions.").

19. *See, e.g., Davis v. State*, 684 So.2d 643, 664–65 (Miss.1996) (rejecting defendant's claim that, because the jury was never instructed that mitigating circumstances were to be found individually and not unanimously, reasonable jurors might have misunderstood the instructions and thought that they were required to be unanimous about any specific mitigating circumstance); *Stiles v. State*, 829 P.2d 984, 997 (Okla.Crim.App.1992) (rejecting defendant's claim that trial court erred in failing to inform jury that unanimous agreement upon the mitigating circumstances was not required before the jury could consider them; "Because the instructions and verdict forms in the present case did not require unanimity regarding mitigating circumstances, nor could they reasonably have been interpreted to require such, we hold that the jury was not precluded from considering any of the mitigating evidence proffered by appellant."); *Nika v. State*, 198 P.3d 839, 856 (Nev. 2008) (rejecting defendant's claim of ineffective assistance of counsel when his attorney failed to request an instruction that the jury did not have to agree unanimously on the

*People v. Hope*,[20] the special mitigation issue read, "If you unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude consideration of a death sentence, then you should sign the verdict requiring the court to sentence the defendant to death."[21] The defendant claimed that the trial judge erred when he refused to give an instruction "on the nonunanimity requirement for mitigating factors." The Illinois Supreme Court disagreed, stating that the instructions did not "convey the impression that unanimity was required before a mitigating factor could be considered in the balance."[22] After all, "a 'sentencing jury is required to unanimously determine that mitigating factors sufficient to preclude the death penalty *do not exist* before that penalty can be imposed.'"[23] Thus, the belief by just one juror that

some mitigating circumstance exists is sufficient to prevent a unanimous rejection of mitigation.[24]

Thus, looking at the jury instructions as a whole, it would be illogical to suppose that there is "a reasonable likelihood" that the jury understood and applied the mitigation issue in a way that prevented even one juror's consideration of any and all mitigating facts, regardless of whether any other juror considered that same fact mitigating.[25]

### 2. The Evidence.

Second, we look at the state of the evidence and its weight. Although the evidence concerning mitigation was not "open and shut," it was not overwhelming either. Appellant, although unmarried, was the

existence of specific mitigating circumstances; "no instruction placed constraints on the jury's ability to find mitigating circumstances"); *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27, 30–31 (1989) (rejecting claim that jurors might have believed that they were required to unanimously find a specific mitigating fact or facts because they were not given a specific jury instruction concerning nonunanimity; "individual jurors were free to weigh whatever mitigating circumstances they perceived, regardless of whether other jurors agreed that those circumstances were established by the evidence. The perceptions of even one juror, alone, with regard to mitigating circumstances, would be sufficient to deny the unanimity required for a sentence of death."); *Hackett v. Price*, 381 F.3d 281, 301 (3d Cir.2004) (finding no reasonable likelihood that jurors could have understood the instructions to require unanimity in finding a specific mitigating fact; "When the jury found unanimously that there was no mitigating circumstance, it left no room to speculate that perhaps one juror was confused about unanimity requirements and therefore precluded from considering mitigating evidence.").

20. 168 Ill.2d 1, 212 Ill.Dec. 909, 658 N.E.2d 391, 410–11 (1995).

21. *Id.* at 411.

22. *Id.*

23. *Id.* (emphasis in original; quoting *People v. Ramey*, 152 Ill.2d 41, 178 Ill.Dec. 19, 604 N.E.2d 275 (1992)).

24. *Id.*

25. See *Boyde v. California*, 494 U.S. 370, 380–81, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (assessing whether there is a "reasonable likelihood" that jurors might have been mislead or confused by an allegedly ambiguous jury instruction on mitigation evidence and noting that "[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Difference among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.").

father of a young child. His own father had been murdered when he was young and, as a result, he had always suffered from depression and sometimes had thoughts of suicide. His sister was raped by a stranger and later impregnated by appellant's stepfather. He was placed on probation as a juvenile because he "became involved with negative peer groups" and started abusing drugs and alcohol. These drugs made him prone to violence and to lose impulse control. Nonetheless, he had worked in an auto detailing shop since his teen years. He was twenty-one at the time he robbed and murdered Hash Patel, the owner of a mini-mart store and a man whom appellant knew.

On the other hand, the State presented evidence of appellant's lengthy criminal history. As a juvenile, appellant was twice adjudicated for assaulting his mother. He was instructed to attend anger management programs, but did not complete them. As an adult, he was convicted of evading arrest and possession of marijuana stemming from an incident in which he was driving a stolen car and led police on a lengthy car chase. He was convicted of assaulting his girlfriend—he dragged her down the stairs, repeatedly punched her, bit her, and threw her in a ditch—when she was eight months pregnant with his baby. Appellant later told her that he had shot at a person named "C–Smalls" with a .45 caliber semi-automatic.

The day before robbing and killing Hash Patel, appellant again punched his girlfriend and told her that he was going to kill her because she had told him that she did not want to see him any more. Immediately before committing the capital murder, appellant forced his way into Daphne Edwards's apartment at gunpoint, made her perform oral sex on him twice, and then stole her car after kissing each of her young children—who had seen the sexual assault upon their mother—on the cheek. After murdering Mr. Patel, appellant picked up a prostitute and the two of them were in the bedroom of a "crack house," smoking crack cocaine when the police arrived.

Given the extent of the evidence of aggravating circumstances, and the relative paucity of mitigating circumstances, it is not particularly surprising that the jury returned its punishment verdict in less than four hours. It did not send out any questions about the jury instructions. All twelve jurors agreed that there were no mitigating circumstances sufficient to call for a life sentence. Appellant makes no persuasive argument that there is a reasonable likelihood that, based on this evidence, one or more of the jurors had found a mitigating circumstance but was somehow dissuaded from registering his verdict because he erroneously believed that every juror had to agree on the same specific mitigating fact.

### 3. The Arguments of Counsel.

Third, we look to the arguments of counsel. Unlike the situation in Ngo, and other cases in which the attorneys or trial judge compounded the jury instruction error by making additional incorrect statements,[26] no one in this case erroneously suggested

---

26. *Ngo v. State*, 175 S.W.3d 738, 750–52 (Tex. Crim.App.2005); *see also Stuhler v. State*, 218 S.W.3d 706, 720 & n. 44 (Tex.Crim.App.2007) (finding egregious harm in jury charge when two separate offenses were submitted in dis- junctive form to jury—one of which was not supported by the evidence—because, "[g]iven the emphasis in the State's evidence and in its final argument, at least some of the jurors might have convicted the appellant under the

that the jurors had to be unanimous in finding a particular mitigating circumstance. Instead, they repeated what they had explained to the jury during voir dire: "Mitigation, as we told you, you'll know it when you see it. You will believe it or you won't."

### 4. Other Relevant Information.

Fourth, we look to other relevant information in the record. Here, both the trial judge and the attorneys repeatedly explained the concept of mitigation and the importance of each juror deciding what, if anything, he should find mitigating during voir dire. The trial judge explained:

There's only two possible punishments. Okay?

Once again, you're to consider, in answering the questions, the evidence that you hear, the circumstances of the offense—you know, what happened, is it bad, is it not as bad as you think—the criminal history, the good history of he defendant, mitigating circumstance, the

background, the mental background of the defendant, all kinds of things. You're to consider it all. If it's given to you, you're to consider it. You don't disregard anything. You. don't have to answer it a certain way, no matter what the evidence is for you. You're entitled to rule on it as you see fit. You can give it what weight you want yourself. But you're to consider it and listen to it all, and give it whatever weight you want.

In other words, if you think this is a mitigating circumstance, that's fine. If you think it's not, that's also fine. It's up to you. It's your decision and your decision alone, the twelve of you. But you're to listen to it all and take it all into account, and disregard what you like, take into account what you don't like, or do like, and go from there.

Similarly, the attorneys repeatedly told the veniremen that "every juror is to look individually and decide for themselves, you know, whether or not ... the evidence is mitigating." They emphasized over and over that each juror should individually

belief that she intentionally or knowingly caused an injury that the evidence does not support."); *Dolkart v. State,* 197 S.W.3d 887, 894 (Tex.App.-Dallas 2006, pet. ref'd) ("As in *Ngo,* the State told the jury in closing argument that it did not have to agree whether appellant committed assault by threat or bodily injury assault. Further, the evidence in this case was contested. Appellant testified and denied the offenses. She claimed she did not intend to hit Thomas but rather it was an accident. Some jurors could have believed appellant and determined that she did not intend to threaten or injure Thomas, but concluded her conduct in driving so close to Thomas was reckless and resulted in his injury. Other jurors could have disbelieved appellant and determined that she intentionally and knowingly followed Thomas too closely to threaten him, resulting only in his fear of imminent bodily injury.... Finally, the record reflects the jury had some confusion regarding the unanimity requirement as evi-

denced by the note it sent out asking, "Does an acquittal of a charge need to be unanimous in order to proceed to a lesser (next charge)?" "); *Palmer v. State,* 222 S.W.3d 92, 96 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd) (finding egregious harm when jury charge erroneously required jury to find the victim's prior rape allegation false beyond a reasonable doubt before it could use that evidence to impeach her credibility; prosecutor repeatedly stressed the erroneous instruction and error went to very basis of hotly disputed facts); *Guevara v. State,* 191 S.W.3d 203, 208 (Tex.App.-San Antonio 2005, pet. ref'd) (erroneous jury instructions caused egregious harm when jury was told it could convict defendant if he did not make a reasonable effort to prevent her murder and the prosecutor argued that jury could and should convict him on this non-existent legal theory).

decide whether a specific fact was or was not mitigating. "It's simply up—in your heart, do you believe there's something about him that sufficiently mitigates [and calls for a] sentence of life rather than death." And "[s]ome people might think one thing is mitigating, Somebody might think, no, that's not." Given the extent to which the jurors were told that each one of them might find a particular fact mitigating while others did not, it defies logic to conclude that they suddenly forgot all of those earlier discussions during their deliberations. It is unreasonable to conclude that, merely because the nonunanimity of mitigating facts wasn't explicitly repeated once again in the jury instructions, the jurors were likely to have thought that they could not find a particular fact mitigating unless all twelve of them agreed on that particular fact. As Yogi Berra would say, "that is making too many wrong mistakes" about the jurors' common sense.

Therefore, although the trial court erred in omitting the statutory jury instruction reminding the jurors that they need not agree on what particular evidence supports an affirmative answer to the mitigation issue, this record does not show that appellant suffered any actual harm—much less "egregious harm"—as a result of that omission.

I join the opinion of the Court.

PRICE, J., dissenting.

I dissent to the Court's rejection of the appellant's fifteenth point of error.[1] In my view, the record reveals both error in the jury charge given at the punishment phase of trial, and "egregious harm" resulting from that error. I would therefore reverse the conviction and remand the cause for a new punishment proceeding.

Since the enactment of the statutory mitigation special issue in 1991,[2] the Legislature has specifically required trial courts at the punishment phase of capital murder cases to instruct jurors that they need not agree on what specific evidence, if any, proffered in mitigation of the death penalty, is sufficient to warrant a normative judgment that life imprisonment is a more appropriate moral response than the death penalty. So long as at least ten jurors can agree that there *are* sufficient mitigating circumstances, they need not agree which circumstance or combination of circumstances triggered their collective normative response. Section 2f(3) of Article 37.071 of the Code of Criminal Procedure mandates such an instruction and is the "law applicable to the case" in contemplation of Article 36.14 of the Code of Criminal Procedure.[3] In failing to give that instruction, the trial court plainly erred.

To determine whether this error was egregiously harmful under *Almanza v. State*,[4] we consider 1) the entirety of the punishment charge itself, 2) the evidence adduced at the punishment phase, including the contested issues and weight of the probative evidence, 3) the arguments of counsel, and 4) any other relevant informa-

1. Majority opinion, at 878–79.

2. Acts 1991, 72nd Leg., ch. 838, § 1, eff. Sept. 1, 1991.

3. Tex.Code Crim. Proc. arts. 36.14 and 37.071, § 2f(3).

4. 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (opinion on reh'g).

tion from the record.[5] When such a review reveals that the error affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory, we conclude that the error was egregiously harmful.[6] The harm must be shown to be "actual," not just "theoretical." [7]

Turning first to the punishment charge as a whole, I note that the mitigation special issue itself is ambiguous with respect to the question whether jurors have to agree that any particular circumstance or circumstances warrant a life sentence. The verdict form that was submitted asked the jury to supply one of two answers to the mitigation special issue:

*Answer*: We, the jury, unanimously find and determine that the answer to this Special Issue is "No".

*Answer*: We, the jury, because at least ten (10) jurors find that there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed, answer this Special Issue "Yes".

The appellant's jurors opted for the first answer. But, contrary to the view of the majority,[8] the jurors' unanimity with respect to their ultimate answer does not guarantee that they unanimously rejected the existence of any mitigating circumstance or circumstances warranting a life sentence. There remains the theoretical possibility that the jurors believed that they could only attain unanimity with respect to whether a sufficient mitigating circumstance or circumstances existed to warrant a life sentence (and hence, choose the first answer) if they could all agree (or at least ten of them) that the *same* mitigating circumstance or circumstances were sufficient to convince them that life was the more appropriate penalty. Absent the Section 2f(3) instruction, there is nothing in the special issue itself or the verdict form to foreclose this possibility.

Nor would anything in the balance of the punishment charge necessarily dissuade the jurors from this view. There is language in the punishment charge pertaining to the future dangerousness special issue that instructed the jurors that they need not all agree with respect to what specific evidence would convince them that the appellant would *not* constitute a continuing threat to society before answering that special issue "no." The conspicuous absence of a similar instruction pertaining to the mitigation special issue could conceivably have convinced the jurors that, in fact, they *did* have to agree on the specific mitigating circumstance or circumstances before answering that special issue "yes." [9] There is nothing else in the punishment charge as a whole that served unequivocally to inform the jurors otherwise.

5. *E.g., Allen v. State*, 253 S.W.3d 260, 264 (Tex.Crim.App.2008).

6. *Id.*

7. *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim.App.2005).

8. Majority opinion, at 879.

9. *See Allen v. State, supra*, at 264–65 ("From the fact that the self-defense instruction contained explicit reasonable-doubt language, the jury might well infer that it should expect to see comparably explicit reasonable-doubt language in the consent instruction if such a standard was indeed applicable there. The conspicuous absence of such explicit language from the consent instruction would not likely have been lost on the jurors.").

Turning to the evidence elicited at trial, I observe that the appellant presented evidence of a tumultuous childhood. When he was eight years old, his father was murdered and his sister was molested and impregnated by his stepfather. The appellant argued that he never recovered from these events emotionally as he never received the counseling or the father figure that he needed. He became angry and withdrawn and began using drugs. There was also evidence that at the time he committed the capital murder he was under the influence of alcohol, marijuana and crack cocaine. It is conceivable that the jurors could have harbored various opinions as to the mitigating value of this evidence. Some might have believed the evidence of a disadvantaged childhood warranted a life sentence, but not the evidence of intoxication, while others might have believed vice-versa. If at least ten jurors believed that *one or the other* was mitigating, but no ten jurors could agree on *either one*, and the jurors construed the special issue to require agreement as to the specific mitigating evidence that warranted a life sentence, they could have erroneously (but unanimously) answered the special issue "no."[10] Again, the *theoretical* harm is quite evident.

During final arguments, defense counsel independently argued the mitigating significance of both the evidence of the appel-

lant's disadvantaged childhood and of his intoxication at the time of the offense. For its part, the State argued that the appellant had other father figures in his life, and that the evidence showed the drugs and alcohol had not affected him on the morning of the offense. The State did *not* suggest, however, that the jurors would have to agree upon the specific evidence that they found sufficient to warrant a life sentence before they could answer the mitigation special issue "yes."[11] Instead, the State argued that *none* of the appellant's mitigating evidence was compelling enough to cause the jury to exercise its normative judgment to assess a life sentence. Still, because there was more than one kind of mitigating evidence that might independently have warranted a life sentence, it cannot be ruled out that the question came up in the jury room whether unanimity was required with respect to the particular mitigating circumstance or circumstances that justified life. The jurors deliberated for just under four hours before returning their punishment verdict. During that time they did not send out a jury note or otherwise indicate a struggle to resolve any ambiguity in their understanding of the requirements of the mitigation special issue. But the lack of a jury note is not determinative. It could just as readily indicate that, in the absence of an explicit instruction, the jurors mistakenly

**10.** Moreover, as the appellant points out, a juror who believed he had to answer the mitigation special issue "no" unless at least ten jurors could agree that either the disadvantaged childhood or the intoxication (or both) warranted a life sentence would not likely cause the jury to deadlock by persisting in his own personal view that the mitigation was sufficient, thus assuring a life sentence. *See* TEX.CODE CRIM. PROC. art. 37.07 § (g) ("If the jury ... is unable to answer any issue submitted under Subsection ... (e) of this article, the court shall sentence the defendant

to confinement in the institutional division of the Texas Department of Criminal Justice for life.").

**11.** *Compare Ngo v. State, supra,* at 750–51 (egregiously harmful jury charge error found in failing to require jury unanimity where, *inter alia,* three times during course of trial judge and prosecutor erroneously informed jurors that they need *not* be unanimous in their verdict when in fact the law required them to be).

concluded that they *did* have to be unanimous as that they correctly concluded that they did *not.*

The record cannot rule out, therefore, that the theoretical harm in this case did not ripen into actual harm. We have said that there is no burden of proof when it comes to an analysis for egregious harm.[12] In a case for egregious harm that is as close as this one, and when the ultimate penalty is at stake, we should err on the side of caution.[13] It is clear enough that the trial court's error deprived the appellant of a valuable right—the right to be assured that the jurors would not deliberate upon his variable mitigating evidence under the mistaken assumption that they must agree on which mitigating circumstance or circumstances warranted life before finding such a sentence appropriate. I would therefore hold that the appellant suffered egregious harm, reverse his conviction, and remand the cause for a new punishment hearing. Because the Court does not, I respectfully dissent.

---

**12.** *Warner v. State,* 245 S.W.3d 458, 464 (Tex. Crim.App.2008).

**13.** *Cf. O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (even in context of federal habeas review of state court judgments, where State's interest in finality is at its zenith, federal judge who finds record in equipoise with respect to whether error is harmless should conclude that the error is harmful).