

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-14-00115-CR

---

CORDERO BROWN, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 42,258-B

---

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

Cordero Brown was convicted by a Gregg County jury of aggravated robbery and sentenced to sixty years' confinement in the Texas Department of Criminal Justice Correctional Institutions Division. Brown appeals to this Court claiming (1) that the trial court erred in refusing his *Batson*[1] challenges, (2) that there is insufficient evidence to support his conviction, (3) that the trial court erred in denying his request for an alibi jury instruction, (4) that the trial court erred in admitting, during the punishment phase, a photograph of Brown with a gun, and (5) that the trial court erred in admitting a 9-1-1 audio recording that had not been disclosed to Brown prior to trial. Since we find the trial court's refusal of Brown's *Batson* challenges was not clearly erroneous, that there was sufficient evidence to support Brown's conviction, that the trial court did not err in refusing to give an alibi instruction, and that the trial court did not abuse its discretion in admitting the photograph and the 9-1-1 recording, we affirm the trial court's judgment.

## I. Background

Around 10:00 on the morning of January 14, 2013, Jera Lynn Johnson was in her bedroom studying when she heard her door bell and loud banging at her front door. She was not expecting visitors, so she did not answer the door. A couple of minutes later, she heard the French doors on the back of her house being kicked open. She got up to investigate and was confronted in the hall by a tall, slender, black man with a gun. He told her he was going to kill her, pointed the gun to her temple, grabbed her hair, and took her into the living room, banging her head on the wall along the way. He continued to threaten her throughout the course of the robbery. Johnson testified that

---

[1]*See Batson v. Kentucky*, 476 U.S. 79 (1986).

she took the threat seriously and feared for her life. She testified that two other individuals participated in the robbery—another tall, slender person and a shorter person—but she was not sure of the sex of either of these participants. According to Johnson, all three robbers were wearing dark gray or black hoodie-type sweatshirts, and two of them were wearing ski masks.

For approximately thirty minutes, the two in ski masks were taking things out of Johnson's house and to their minivan. The man with the gun was holding Johnson by her hair and demanding to know the location of her money, jewelry, and guns. He took her back to her bedroom to get her purse, banging her head on the walls and the door as they went. They took all of her gold jewelry, which she had stored in a jewelry armoire in her master bathroom and in several boxes in her closet. The robbers also took a silver-dollar necklace, three television sets, a 20-gauge shotgun, cash, a cell phone, and a camera. At one point, Johnson was able to see the top of their white vehicle. Before they left, the three together took Johnson to her garage where they taped her mouth shut, put tape over her eyes, and then taped her hands and feet together. Then they forced her to get in the trunk of her car. The man with the gun told her he was going to let her suffocate and closed the trunk.

Texas Department of Public Safety Trooper Jacob Muehlstein and another trooper responded to a dispatch prompted by a neighbor's 9-1-1 call reporting a suspicious white minivan parked at Johnson's house, with three men coming in and out of the house carrying items from the house to the van. The initial call came in at 10:36 a.m., and the troopers responded at 10:40 a.m. When they entered the house, it appeared that it had been burglarized and ransacked. After searching the house and finding no one, they heard Johnson calling for help from the garage.

3

Johnson had managed to get the duct tape off of her mouth and to pull the trunk release. They helped her out of the trunk and removed the remaining duct tape.

Deputy Charles Easterling with the Gregg County Sheriff's Office was dispatched to Johnson's house at 10:39 a.m. When he arrived, Easterling talked with Johnson about twenty minutes after she had been removed from the trunk of her car, and he opined that she was in shock. At the time, Johnson said she first heard the knocking at 9:30 a.m. After Easterling secured the scene, the investigators took over. Easterling also assisted in the traffic stop when the suspects were arrested, and he took them to be booked into jail.

Margaret Adkins, Johnson's across-the-street neighbor who called 9-1-1 the morning of the incident, testified that she saw a white minivan parked in Johnson's driveway. She described the minivan as having a rounded back similar to the one depicted in State's Exhibits 42 and 43. She saw two people make several trips carrying property out of Johnson's house to the minivan. She tried to telephone Johnson, who did not answer, and when she hung up three people ran out of the house, jumped in the minivan, and drove off. Adkins testified that they all wore hoodies, that all three were slender, and that one was shorter than the other two.

Claire Alford, owner of the Gold Rush Mercantile and Trading Company (the Gold Rush), identified Brown as one of three men that came into her store on the morning of January 14, 2013, around 10:45 or 11:00. She knew all three of them and identified the other two, one as Reco and the other as Reco's brother, Lorenzo.[2] Alford had done business with Brown for over a year before that day. She bought jewelry from all three that day, and the process took about one hour. Due to

---

[2]Reco and Lorenzo Chester are the brothers of Brown's wife, Sandra Brown.

4

the abnormally large volume of jewelry the men sold to Alford that day, she had to pay Brown with a check. She explained that the transaction took so long because of the volume of jewelry; she tests each piece individually to determine its authenticity and the amount of gold contained in the piece.

Alford also testified that Brown was wearing a black hoodie and that his demeanor was more excited and energetic on this occasion than at other times he had been in the store when he was generally laid back. She described Reco and Lorenzo as taller, younger, and bigger than Brown and indicated that they were wearing t-shirts. She identified State's Exhibit 45 as a receipt listing everything she purchased from Brown that day, along with an image of his driver's license. She also identified State's Exhibits 46 and 47 as copies of the $1,250.00 check she gave Brown that day. Based on the timestamp on the check, it was cashed at 11:58 a.m. at Citizens National Bank. Alford testified that she banks with Citizens National Bank, which is about one and one-half miles from the Gold Rush. Alford also identified the receipts for the jewelry she purchased from Lorenzo and Reco that same day.

According to Alford, Brown was the last of the three to transact business, and she got nervous because he was so "hyper" and was acting so strangely. Alford further testified that around 5:00 p.m. that day, she heard about a robbery of an elderly woman in which a large amount of gold jewelry was stolen, and she called the police to report that three young men had sold a significant amount of gold jewelry to her that morning. She talked to an emergency services dispatcher and then several different departments and ultimately received a return call about

5

9:00 p.m. On cross-examination, she denied having read an article regarding the burglary in the Longview paper and changing her estimate of the time the men came into her store.

Jeremy Simpson, an employee of the Gold Rush, also testified at trial. He identified Brown as an individual who sold gold jewelry to the Gold Rush on January 14, 2013. He confirmed that Brown came in with two other men, both taller and bigger than Brown, around 10:45 or 11:00 a.m. on January 14. He identified State's Exhibits 12, 13, 14, and 15 as photographs of the jewelry the three men sold that day. He said that Brown was wearing a black hoodie and that one of the other men was wearing a white T-shirt. According to Simpson, the other two were pumped up and giggling, while Brown was straight-faced and even scolded the other two at one point. He acknowledged that on January 15, he told investigators that the men came into the store between 11:15 a.m. and 11:30 a.m., but that he changed his estimate to between 10:45 a.m. and 11:00 a.m. in an interview two days later after he and Alford discussed the matter. He denied having read an article in the Longview paper about the robbery before his interview. He also confirmed that the three men stayed in the store about an hour.

Megan Clark testified that she was working at Citizens National Bank on January 14, 2013. According to Clark, around noon that day, she saw an individual come into the bank wearing a hoodie sweatshirt. Tara Roberts was working as a teller at the bank on January 14, 2013, and she cashed a check for an individual wearing a black hoodie. Clark identified State's Exhibit 54 as a copy of the surveillance video recording from the bank's security cameras showing the individual enter the bank at 11:54 a.m. and exit at 11:59 a.m.

6

Lieutenant Kirk Haddix, who directs the Criminal Investigations Division of the Gregg County Sheriff's Department, also testified at trial. According to Haddix, he and two of his investigators, Terry Mitchell and Floyd Wingo, participated in the investigation of this case. Haddix further testified that a white minivan was stopped around 5:00 p.m. on January 15, 2013. Sandra (Brown's wife), Reco, and Lorenzo were in the minivan. After the van was towed, the investigators obtained a search warrant covering the vehicle. Haddix identified State's Exhibits 59 through 68 as photographs of items found in the van, including a black jacket, a gray hoodie, a small gold-colored jewelry box, a gold necklace, a gold ring, a plaid hoodie, two sets of athletic gloves, a blue ski mask, a black ski mask, six medicine bottles, boots, and an earring, all of which were introduced into evidence at trial. He identified State's Exhibit 38A as the necklace and gold ring that were in the van. In her testimony, Johnson had previously identified these items as items that were taken in the robbery.

Haddix acknowledged that no DNA evidence, soil samples, or fiber samples placed Brown at the Johnson residence. He explained that since the only DNA that was found at Johnson's house belonged to her, there was nothing to trace back to Brown or the other suspects; thus, there was no DNA to place them at Johnson's house.

Chris Miller, an investigator with the Gregg County District Attorney's Office, testified regarding his interview of Brown. According to Miller, a silver-dollar pendant, introduced at trial as State's Exhibit 41A, was in Brown's possession when he was interviewed at the sheriff's office. Johnson had previously identified this pendant as being on a necklace belonging to her that was

taken in the robbery. When asked where he got the pendant, Brown provided no explanation and claimed he had had it for a while and that he had it when his youngest child was born.

In his interview by Miller, Brown claimed he was at his house during the time of the robbery with his children and that his wife, Sandra, was at work. Miller learned from Sandra's employer that she was actually not at work that day. Later in the interview, Brown denied any involvement in the robbery, but admitted selling the jewelry. He also claimed that his wife was at his house with him. Brown said that Reco and Lorenzo brought the jewelry to him and that he took it to the Gold Rush and sold it for cash. He claimed he did not know how they arrived at his house because he was asleep. Brown told Miller that his DNA would not be in Johnson's house, but he refused to provide a DNA sample. Brown admitted that he sold the jewelry after Miller showed him a receipt with his driver's license number on it.

When Mitchell, the chief investigator, initially interviewed Simpson, Simpson said the suspects had arrived at the Gold Rush between 11:15 a.m. and 11:30 a.m. In his audio/video recorded interview, Simpson said the time was actually between 10:45 a.m. and 11:00 a.m. When Mitchell first talked with Alford, she said the men arrived at the Gold Rush around 11:30 a.m., but in her recorded interview, she said the actual time was between 10:45 a.m. and 11:00 a.m. Both Simpson and Alford told Mitchell that three black males came in with gold jewelry and that the Gold Rush bought the jewelry. Simpson and Alford produced a plastic bag containing jewelry that they identified as the jewelry purchased from the men. Mitchell poured it out, photographed all of it together, and then took individual photographs of some of the unique pieces. He then took

8

the jewelry to Johnson to see if she could identify any of the pieces. He removed the pieces she identified and tagged them as evidence in this case.

Mitchell also testified that he mapped out routes and drove from Johnson's house to the Gold Rush, from Johnson's house to Brown's house, and from Brown's house to the Gold Rush, three times each, to check the mileage and travel time between destinations. From Brown's house to Johnson's house took eighteen minutes each time. From Johnson's house to the Gold Rush took twenty minutes one time and eleven minutes each of the other two times. From Brown's house to the Gold Rush took sixteen minutes each time. He also testified that the booking sheets from their arrests show that Brown is five feet, four inches tall; that Reco is five feet, eleven inches tall; and that Lorenzo is six feet, one inch tall.

In his defense, Brown called Sandra to testify. She testified that on the day of the incident, she was living with Brown, their three children, and Brown's father. She said that on January 14, she stayed at home while Lorenzo borrowed her minivan between 8:00 a.m. and 9:00 a.m. Lorenzo left and came back later with Reco around 11:00 a.m. or noon. Sandra claimed that Brown was at home during this time. Sandra testified that upon his return, Lorenzo awoke Brown and told him he needed him to do something for him, at which point Brown got out of bed and went with Lorenzo. Sandra testified that on January 15, 2013, she was driving Lorenzo to a friend's house and Reco to his girlfriend's house when, after pulling into a store parking lot, police surrounded the van and arrested everyone inside. She admitted that she never told the police that Lorenzo committed the robbery. She also testified that Lorenzo, Reco, and Brown are friendly and hang out together. She testified that she did not remember seeing the silver-dollar pendant.

9

Brown also testified in his own defense. He denied that he was involved in the robbery. He said that he was at home with his wife and children on the morning of January 14, 2013, and that he was awakened by Lorenzo. According to Brown, Lorenzo asked him to help sell some jewelry for cash, Brown agreed, and he got dressed. Brown said Lorenzo did not tell him that the jewelry was stolen, explaining that Lorenzo said he thought if more than one person went in to sell the jewelry, there was a better chance of getting more money. Brown claimed that the jewelry had already been separated and put in Ziploc bags when it was given to him. He testified that it only took two to four minutes for him to get up, get dressed, brush his teeth, and leave. He took back roads to the Gold Rush, but testified it only took approximately sixteen minutes to get there. He testified that they were not at the Gold Rush long, estimating that the process took no longer than thirty minutes.

Brown admitted that he cashed the check he received from the Gold Rush and claimed that he gave the money to Lorenzo. Lorenzo gave Reco and Brown $300.00 each for helping him sell the jewelry. Brown claimed that when he was arrested and accused of being involved in an aggravated robbery, he was shocked and scared. He admitted that he lied about the silver-dollar pendant during his police interview and claimed that Lorenzo let him keep it. He claimed that he lied because he was scared and knew he could not explain how he came to possess the pendant. He admitted that the jewelry he sold that day may have been ten times the volume he had ever sold at the Gold Rush before. He also acknowledged that Reco and Lorenzo did not have jobs at that time and that they were "bouncing" from house to house living with different people. He admitted

10

that he was surprised when they had $2,500.00 worth of gold, but claimed he still did not know how they got it.

## II.     The Trial Court Did Not Err in Denying Brown's *Batson* Challenges

In his first point of error, Brown complains that the trial court erred in denying his *Batson* challenges. After Brown and the State exercised their peremptory challenges, Brown challenged the jury under *Batson* and Article 35.261[3] of the Texas Code of Criminal Procedure, requesting dismissal of the jury and the assembly of a new array. Brown pointed out that he was an African-American and that there were no African-Americans seated on the jury. Specifically, he argued at trial and argues on appeal that veniremembers 2 (Rogers), 22 (Bee), and 34 (Hawkins) were improperly struck without race-neutral explanations by the State.

Use of peremptory challenges to strike potential jurors on the basis of race is prohibited by both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, U.S. CONST. amend. XIV, § 1; *see Batson*, 476 U.S. at 85–86, and Article 35.261 of the Texas

---

[3]Article 35.261 provides

> (a)     After the parties have delivered their lists to the clerk . . . and before the court has impanelled the jury, the defendant may request the court to dismiss the array and call a new array in the case. The court shall grant the motion of a defendant for dismissal of the array if the court determines that the defendant is a member of an identifiable racial group, that the attorney representing the state exercised peremptory challenges for the purpose of excluding persons from the jury on the basis of their race, and that the defendant has offered evidence of relevant facts that tend to show that challenges made by the attorney representing the state were made for reasons based on race. If the defendant establishes a prima facie case, the burden then shifts to the attorney representing the state to give a racially neutral explanation for the challenges. The burden of persuasion remains with the defendant to establish purposeful discrimination.

> (b)     If the court determines that the attorney representing the state challenged prospective jurors on the basis of race, the court shall call a new array in the case.

TEX. CODE CRIM. PROC. ANN. art. 35.261 (West 2006).

11

Code of Criminal Procedure, TEX. CODE CRIM. PROC. ANN. art. 35.261.  If the defendant suspects the State of making race-based challenges, he may request a *Batson* hearing.  *See* TEX. CODE CRIM. PROC. ANN. art. 35.261(a).

Courts use a three-step process in determining *Batson* challenges.  *Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008); *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009).  Initially, the defendant must present a prima facie case that the State exercised its peremptory challenges on the basis of race.  *Snyder*, 552 U.S. at 476; *Young*, 283 S.W.3d at 866.  The State must then articulate a race-neutral explanation for its challenged strikes.  *Snyder*, 552 U.S. at 476–77; *Young*, 283 S.W.3d at 866.  A race-neutral explanation is one "based on something other than the race of the juror."  *Hernandez v. New York*, 500 U.S. 352, 360 (1991).  If no discriminatory intent is inherent in the explanation, then the reason is deemed race neutral.  *Id.*  The defendant may rebut the State's explanation, but the burden of proving purposeful discrimination remains with the defendant.  *Young*, 283 S.W.3d at 866.  In the final step, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *Hernandez*, 500 U.S. at 360; *Young*, 283 S.W.3d at 866.

In reviewing a *Batson* ruling, we consider the record in the light most favorable to the trial court's ruling.  *Young*, 283 S.W.3d at 866.  The trial court's decision will not be disturbed unless it is clearly erroneous.  *Hernandez*, 500 U.S. at 369; *Young*, 283 S.W.3d at 866; *Jackson v. State*, 442 S.W.3d 771, 774 (Tex. App.—Texarkana 2014, no pet.).  To determine whether the trial court's decision was clearly erroneous, we examine the record to see whether we are left with a "'definite and firm conviction that a mistake has been committed.'"  *Guzman v. State*, 85 S.W.3d

12

242, 254 (Tex. Crim. App. 2002) (quoting *United States v. Fernandez*, 887 F.2d 564, 567 (5th Cir. 1989)).  The trial court is in the best position to determine whether the State's race-neutral explanation is genuine, so we defer to its ruling barring exceptional circumstances.  *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012).  The trial court "'must focus on the genuineness of the asserted non-racial motive, rather than the reasonableness.'"[4]  *Jackson*, 442 S.W.3d at 774 (quoting *Nieto*, 365 S.W.3d at 676).  In our review, we "consider the entire record of the voir dire," and we are not limited to "the specific arguments brought forth to the trial court by the parties." *Nieto*, 365 S.W.3d at 676 (citing *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008)). We do not substitute our judgment for the trial court's when considering whether the State's explanation was a pretext.  *Id.*  Like the trial court, we consider the genuineness, not the reasonableness, of the proffered non-racial explanation.  *Id.* (citing *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004)).

Since the State offered reasons for its strikes, the question of whether Brown presented a prima facie case is moot.  Consequently, our analysis begins with whether the State's reasons are race neutral.  *See Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002).  The record before

---

[4]Brown argues that we should apply the five-factor analysis set forth in *Whitsey v. State*, 796 S.W.2d 707, 713–14 (Tex. Crim. App. 1989) (citing *Keeton v. State*, 749 S.W.2d 861, 866, 870 (Tex. Crim. App. 1988)).  However, that analysis was taken from an earlier case that rejected the clearly erroneous standard.  *Id.* at 712–14 (citing *Keeton*, 749 S.W.2d at 866).  In setting forth this analysis, the Texas Court of Criminal Appeals relied on language in *Batson* that "[t]he prosecutor must give 'clear and reasonably specific' explanations of 'legitimate reasons' for his use of peremptory challenges." *Id.* at 713 (citing *Batson*, 476 U.S. at 98 n.20).  Subsequently, the United States Supreme Court in *Purkett* clarified that what *Batson* "means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett*, 514 U.S. at 769.  The Court went on to make clear that it is the *genuineness* of the explanation, not its *reasonableness*, that is to be analyzed. *Id.*  After *Purkett*, it is unclear to what extent the *Whitsey/Keeton* analysis remains viable.  Brown does not point us to post-*Purkett* cases that employ that analysis.
.

us shows that there were seven African-Americans who were potential jurors. One was struck for cause. Of the remaining six, the State struck three,[5] and Brown struck one. After Brown raised his *Batson* challenge at trial, the State offered its explanations for exercising the three peremptory strikes in the manner it did. The State explained that veniremember Rogers was struck because she was twenty-one years old and had lip, nose, and ear piercings.[6] There is nothing inherently discriminatory in this explanation. The concern about the age of a potential juror can be genuine, and lip, nose, and ear piercings are not peculiar to any one race.[7] *See Purkett*, 514 U.S. at 769. We hold that the State proffered a race-neutral explanation for striking veniremember Rogers.

Veniremember Bee was a retired postal worker, and veniremember Hawkins was an active postal employee at the time of trial. The State explained that it "has had a problem with postal workers in the past, and that's very scary to this prosecutor working in this particular venue." We have previously held that when the State says that it struck a potential juror based on the person's employment and that it has not had good success with that type of worker, the explanation is race neutral. *Middleton v. State*, 187 S.W.3d 134, 142 (Tex. App.—Texarkana 2006, no pet.); *see also Tompkins v. State*, 774 S.W.2d 195, 205 (Tex. Crim. App. 1987), *aff'd*, 490 U.S. 754 (1989)

---

[5]The State used three of its eleven peremptory strikes.

[6]Brown does not challenge the accuracy of the State's description of Rogers.

[7]In his brief, Brown "wonders just how many of the seven Anglo women who made the jury might have had their ears pierced." However, speculation is not proof, and Brown offered no proof at trial that any of the non-struck jurors had lip, nose, and ear piercings. He also argues that since the State offered no explanation of why it was concerned or how piercings would show the presence of bias, the "case for pretext is very strong." However, the State does not have the burden to show that its reasons are plausible. *See Pitte v. State*, 102 S.W.3d 786, 790 (Tex. App.—Texarkana 2003, no pet.); *see also Purkett*, 514 U.S. at 766–69 (holding that striking juror "because he had long, unkempt hair, a mustache, and a beard[] is race neutral and satisfies the prosecution's step two burden of articulating a nondiscriminatory reason for the strike").

14

(holding strike based on employment with postal service was race-neutral); *Leadon v. State*, 332 S.W.3d 600, 613–14 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (same); *Moore v. State*, 265 S.W.3d 73, 84 (Tex. App.—Houston [1st Dist.] 2008, pet. dism'd) (same). In *Middleton*, the State struck the only two African-American jurors on the venire panel. The State explained that it struck them because they were employed by the University of Texas and that such employees had been found to be "anti-prosecution" in the past. *Middleton*, 187 S.W.3d at 142. In holding that the State had proffered a race-neutral explanation for striking the veniremembers, we noted that Middleton had not alleged or shown that there were other panel members who were employees of the University of Texas. *Id.* As in *Middleton*, Brown neither showed in the trial court nor alleges on appeal that there were non-struck jurors who were post office employees. We hold that the State proffered a race-neutral explanation for striking veniremembers Bee and Hawkins.

In addition, Hawkins was troubling to the State because he thought his brother had been wrongfully accused in the past. Hawkins' testimony in this regard came in response to the State asking whether any of the veniremembers, or their loved ones, had had any experience with theft or a violent crime. After several veniremembers related their experiences as victims of crime, Hawkins testified that his brother had been falsely accused of robbery and had to go through a prolonged trial to prove his innocence. Brown complains that although the State sought to rehabilitate the victims of crime, it made no attempt to rehabilitate Brown. We decline to hold that the State had a duty to attempt to rehabilitate a veniremember potentially hostile to its prosecution. Rather, Brown had the burden of proving his *Batson* challenge, as well as the concomitant burden of showing that Hawkins could be fair and impartial in spite of his past experience. Brown has

15

identified no place in the record demonstrating that he made this showing. Further, even if Hawkins had been rehabilitated, the State would still be entitled to assume Hawkins would be adverse to its interests based on his past experience. *See Johnson*, 68 S.W.3d at 649. We hold that the State's concern over Hawkins' past experience with a false accusation and the resulting prosecution was a race-neutral explanation for striking him.

After the State offered race-neutral explanations for the exercise of its strikes, Brown offered no rebuttal. "When the trial court is offered no evidence in rebuttal of the State's race-neutral explanation, the reviewing court is not in a position to say that it feels a definite and firm conviction that the trial court made a mistake." *Pitte*, 102 S.W.3d at 791 (citing *Ford v. State*, 1 S.W.3d 691, 693–94 (Tex. Crim. App. 1999)); *see also Johnson*, 68 S.W.3d at 649 (defendant's failure to offer any rebuttal to State's explanation can be fatal to *Batson* claim). Based on the record before us, we find that the trial court's denial of Brown's *Batson* challenges was not clearly erroneous. We overrule this point of error.

## III. There Is Sufficient Evidence to Support the Conviction

In his next point of error, Brown challenges the legal sufficiency of the evidence to support his conviction for aggravated robbery. Brown argues that the evidence is circumstantial and controverted, that no one positively identified him as being at the scene of the crime, that witnesses' initial statements regarding the time of the robbery and his arrival at the Gold Rush contradicted their later statements and trial testimony, and that, at most, he possessed and participated in the sale of stolen goods.

16

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trier of fact's verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the trier of fact "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). The jury "is the sole judge of the credibility of the witnesses and the weight of the evidence." *Hartsfield*, 305 S.W.3d at 869 (citing *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999)). We give "'almost complete deference to a jury's decision when that decision is based on an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

In our review of the sufficiency of the evidence, we look at "'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). Each fact need not "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* Circumstantial and direct evidence are equally probative in establishing the guilt of an actor, and guilt can be

17

established by circumstantial evidence alone. *Id.* (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a "hypothetically correct jury charge." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

The indictment in this case alleged that Brown

did then and there . . . while in the course of committing theft of property and with intent to obtain and maintain control of said property, intentionally and knowingly threaten or place Jera Johnson in fear of imminent bodily injury or death, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm;

Brown individually committed the offense of aggravated robbery with a deadly weapon if (a) while in the course of unlawfully appropriating property, and (b) without Johnson's consent (c) with the intent to deprive her of the property, (d) Brown (e) intentionally or knowingly (f) threatened or placed Johnson in fear of bodily injury or death (g) while using or exhibiting a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 29.02(a)(2), 29.03(a)(2) (West 2011), § 31.03(a), (b)(1) (West Supp. 2014). A firearm is a deadly weapon per se. TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (West Supp. 2014).

Under the law of the parties,[8] "[a] person is criminally responsible as a party to an offense

---

[8]Although the indictment did not allege Brown committed the offense in conjunction with others, the jury charge included instructions on criminal responsibility (1) as a party and (2) in an attempt to carry out a conspiracy to commit

18

if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West 2011). "A person is criminally responsible for an offense committed by the conduct of another if: . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011). Further, "[i]f in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy." TEX. PENAL CODE ANN. § 7.02(b) (West 2011).

Thus, Brown committed aggravated robbery with a deadly weapon as a party if *either* (a) he acted with intent to promote or assist another person in the commission of the offense by encouraging, aiding, or attempting to aid that other person in the aggravated robbery of Johnson with a firearm, or (b) one of the conspirators committed the aggravated robbery in furtherance of carrying out the conspiracy to commit theft and Brown should have anticipated that aggravated robbery could result from the conspiracy.

Johnson testified at trial that one of the perpetrators held her at gun point, banged her body and head against walls and a door, and threatened her life. She testified that she feared for her life when he made these threats. Johnson described the perpetrator holding her at gun point as a tall,

---

a felony. Brown did not object to the inclusion of these instructions in the charge and does not complain of charge error in this appeal.

19

slender, black man. The other two perpetrators were also slender—one tall and the other one shorter. Since these two were wearing ski masks and hoodies, she was not sure whether they were male or female. She testified that the other two individuals made several trips to their minivan carrying out televisions, jewelry, and a shotgun. She also testified that all three perpetrators took her to the garage, emptied the trunk of her car, placed duct tape on her mouth, hands, and feet and closed her in the trunk, telling her she would suffocate. At trial, Johnson was also able to identify items of jewelry that were stolen from her home on that day, including gold jewelry that was identified as having been sold by Brown to the Gold Rush, items recovered from Brown's van, and a silver-dollar pendant that was in Brown's possession when he was arrested. Brown does not dispute this evidence, and a reasonable jury could believe this evidence. Thus, this evidence is sufficient to support a finding that an aggravated robbery was committed.

Nevertheless, Brown insists that there is insufficient evidence to show he was involved in the robbery. He points to the fact that no one at trial positively identified him as the shortest person involved in the robbery.[9] Johnson testified that the shorter man wore a dark hoodie and a ski mask, so a positive identification of him would be unlikely. However, the circumstantial evidence implicating Brown as the shortest person involved in the robbery is substantial.

The evidence showed that the van used in the robbery was a white minivan matching the description of the one driven by Brown, that Brown used the van to drive to the Gold Rush to sell the jewelry, and that he drove it to the bank to cash the check he received as payment for the

---

[9]At trial and in his brief to this Court, Brown never disputes the State's contention that Lorenzo and Reco were the two taller men involved in the robbery.

20

jewelry he sold. Brown was accompanied to the Gold Rush by his two brothers-in-law, Lorenzo and Reco. Lorenzo is six feet, one inch tall, Reco is five feet, eleven inches tall, and Brown is only five feet, four inches tall. In addition, when Lorenzo and Reco were arrested in Brown's van the day after the robbery, the police found hoodies, ski masks, and gloves. These facts generally matched the descriptions provided by Johnson and other witnesses of the three perpetrators.

Further, it is true that Alford's and Simpson's trial testimony about the timing of Brown's arrival at the Gold Rush and the duration of his transaction differed from their original statements to police. Yet, the differences between their statements and trial testimony were not so great that no reasonable jury could have believed their trial testimony. Moreover, their trial testimony could have supported Brown's version of the facts, and his attorney argued that point strenuously in closing. On one hand, a reasonable jury could have concluded that based on Alford's and Simpson's trial testimony, there was insufficient time for Johnson and Reco to leave Johnson's house around 10:30 a.m., travel to Brown's house, awaken him, wait for him to get dressed, and then travel to the Gold Rush to arrive between 10:45 a.m. and 11:00 a.m. On the other hand, a reasonable jury could have also concluded that the more probable scenario was that Lorenzo, Reco, and Brown were together at Johnson's house during the robbery and drove directly from there to the Gold Rush. In short, a reasonable jury could have sorted out these versions and inconsistencies and have reached the conclusion that Brown was guilty.

Finally, as previously discussed, Johnson identified items sold by Brown to the Gold Rush, items recovered from Brown's van, and the silver-dollar pendant in his possession when he was arrested as items stolen from her during the robbery. Although Brown admitted selling the jewelry

21

to the Gold Rush, the jury, as the sole judge of the credibility of witnesses, could have found his explanation of how he came into possession of the jewelry unbelievable. Further, when initially questioned about the silver-dollar pendant, Brown could not explain where he got it, but still claimed that he had owned it for several years. However, his wife testified that she had never seen the silver-dollar pendant. Since Brown failed to provide a reasonable explanation of how he came into possession of the pendant at the time of his arrest, the jury was permitted to draw an inference of his guilt. *See Hardesty v. State*, 656 S.W.2d 73, 76 (Tex. Crim. App. 1983) (citing *Williams v. State*, 631 S.W.2d 171 (Tex. Crim. App. [Panel Op.] 1982)). Based on this considerable circumstantial evidence pointing to Brown's guilt, we find that there was sufficient evidence to support the conviction. We overrule this point of error.

## IV. There Was No Error in Refusing the Alibi Instruction

In his next point of error Brown complains that the trial court erred in refusing to include his requested instruction on alibi in the jury charge. We review alleged jury charge error using a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we determine whether an error occurred; then, if so, we determine whether the error was sufficiently harmful to require reversal. *Id*. at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see also Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). The degree of harm required for reversal depends on whether the defendant objected to the alleged charge error in the trial court. *Abdnor*, 871 S.W.2d at 732. When a proper objection is made at trial, reversal is required if the error is "calculated to injure the rights of defendant," and the appellant need only demonstrate "some harm" on appeal. *Id*.; *see also Almanza*, 686 S.W.2d

22

at 171.  If a defendant does not object to the charge, reversal is required only if the harm is egregious, that is, if it denied the defendant a "fair and impartial trial," "go[es] to the very basis of the case," "deprive[s] [the defendant] of a 'valuable right,'" or "vitally affect[s] his defensive theory." *Almanza*, 686 S.W.2d at 172; *Rudd v. State*, 921 S.W.2d 370, 373 (Tex. App.—Texarkana 1996, pet. ref'd).  Neither party has the burden to show harm.  *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

Brown admits that under Texas precedent, he is not entitled to an instruction on alibi.  *See Giesberg v. State*, 984 S.W.2d 245 (Tex. Crim. App. 1998).[10]  Nevertheless, he argues that refusing to give an instruction on alibi in this case is tantamount to directing a verdict in favor of the State, in violation of his due process rights and his right to a trial by jury guaranteed by the Fifth[11] and Sixth[12] Amendments to the United States Constitution.  Brown cites to a Fifth Circuit Court of Appeals case for the proposition that when a trial court, after hearing evidence in support of a defensive issue, "'declines to charge on that defense, [it] dilutes the defendant's jury trial by removing the issue from the jury's consideration.  In effect, the trial [court] directs a verdict on that issue against the defendant.'"  *Bursten v. United States*, 395 F.2d 976, 981 (5th Cir. 1968) (quoting *Strauss v. United States*, 376 F.2d 416, 419 (5th Cir. 1967) (citing *Bryan v. United States*,

---

[10]Under *Geisberg*, since "alibi is not a statutory defense, affirmative defense, or justification found in Chapters 8 and 9 of the Penal Code, the defense of alibi does not warrant a separate jury instruction."  *Wallace v. State*, 75 S.W.3d 576, 586 n.2 (Tex. App.—Texarkana 2002), *judgment aff'd*, 106 S.W.3d 103 (Tex. Crim. App. 2003) (citing *Geisberg*, 984 S.W.2d at 248–50).

[11]*See* U.S. CONST. amend. V.

[12]*See* U.S. CONST. amend. VI.

373 F.2d 403, 408 (5th Cir. 1967))). However, *Bursten* and the cases cited therein involved direct appeals from convictions obtained in United States district courts under federal law,[13] and none of them involved the refusal of the trial court to submit an alibi instruction.

Brown also asserts that *Sullivan v. Louisiana*, 508 U.S. 275 (1993), guarantees him "a constitutional right to a correct jury charge." In *Sullivan*, the United States Supreme Court held that the Fifth Amendment requirement that the State prove its case beyond a reasonable doubt and the Sixth Amendment guarantee of a trial by jury in criminal cases are "interrelated" such that "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Id.* at 278. *Sullivan* undeniably stands for the proposition that if the trial court's instruction does not require the jury to find that the State has proved all the elements of the charged offense beyond a reasonable doubt, then the defendant is denied his Sixth Amendment right to trial by jury. *See id. Sullivan*, however, concerned a constitutionally defective definition of reasonable doubt that served to "vitiate[] all the jury's findings." *Id.* at 277, 281. In this case, Brown does not contend that the definition of reasonable doubt was defective or that the trial court's charge failed to require the State to prove all the elements of the offense beyond a reasonable doubt. Rather, he argues that he has a constitutional right to an alibi instruction so that "the jury is compelled to consider whether or not the State has in fact, beyond a reasonable doubt, proven the presence[] of [Brown] at the scene of the offense."

---

[13]Both *Bursten* and *Strauss* involved convictions for evading federal income taxes, and *Bryan* involved a conviction for illegal possession of a firearm under federal law. *Bursten*, 395 F.2d at 977; *Strauss*, 376 F.2d at 417; *Bryan*, 373 F.2d at 404.

Neither party cites any state or federal caselaw holding that the refusal to submit an alibi instruction amounts to a denial of a constitutional right. Our own research revealed one federal court of appeals case that has so held. *See United States v. Hicks*, 748 F.2d 854, 857–58 (4th Cir. 1984). In *Hicks*, the defendant was convicted of armed bank robbery. *Id.* at 856. Although neither Hicks nor his girlfriend testified at trial, the government adduced evidence which, although introduced to show he made a false exculpatory statement, raised the factual question of whether he had been with his girlfriend away from the place of the robbery at the time it occurred. *Id.* at 856–57. Hicks requested an instruction on alibi, which was refused by the trial court. *Id.* at 857. In finding that the trial court erred in refusing the instruction, the Fourth Circuit Court of Appeals stated that it is settled law in the Fourth Circuit "that, at least upon proper request, a defendant is entitled to an instruction submitting to the jury any theory of defense for which there is a foundation in the evidence." *Id.* Then, in determining the standard by which the alleged harmlessness of the error should be measured, the Court went on to hold that the trial court's refusal to submit the instruction on alibi implicated the defendant's rights under the Fifth and Sixth Amendments. *Id.* at 857–58. However, this was a direct appeal from a federal district court to a federal appellate court, and the appellate court based its opinion on the violation of the settled procedural law governing courts in that circuit.[14] The fact that alibi was recognized as a defense in the federal courts of that circuit was also a critical factor in the court's analysis.

---

[14]Circuit courts, in their supervisory capacity, "may require district courts to 'follow procedures deemed desirable from the viewpoint of sound judicial practice although in no wise commanded . . . by the Constitution.'" *Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).

Based on our research, the United States Courts of Appeals that have considered the failure of a *state* trial court to give an alibi instruction have uniformly held that, as long as the state trial court's jury charge clearly requires the state to prove all elements of the charged offense beyond a reasonable doubt, then the refusal of the state trial court to give an alibi instruction is not a violation of the United States Constitution.[15] *Echols v. Ricci*, 492 Fed. Appx. 301, 313 (3rd Cir. 2012) (unpublished op.);[16] *Duckett*, 67 F.3d at 745; *Simmons v. Warden La. State Penitentiary*, 18 F.3d 936, at *1 (5th Cir. 1994) (unpublished op.); *Baca v. Kerby*, 956 F.2d 277, at *2 (10th Cir. 1992) (unpublished op.); *Jones v. Kemp*, 794 F.2d 1536, 1540–41 (11th Cir. 1986); *Manning v. Rose*, 507 F.2d 889, 895 (6th Cir. 1974); *United States ex rel. Waters v. Bensinger*, 507 F.2d 103, 105 (7th Cir. 1974); *United States v. Harris*, 458 F.2d 670 (5th Cir. 1972). In those cases in which there was alibi evidence and the defendant requested an alibi instruction, the courts have uniformly refused to find a constitutional violation based solely on the failure to give the requested instruction. *See Echols*, 492 Fed. Appx. at 313; *Duckett*, 67 F.3d at 745; *Presley v. Rees*, 782 F.2d 1043, at *1–2 (6th Cir. 1985) (unpublished op.); *Bensinger*, 507 F.2d at 104–05. Significantly, the federal courts recognize that under the individual states' laws, alibi may be recognized as "merely a method of disproving the prosecution's case." *Bensinger*, 507 F.2d at 105; *see Echols*, 492 Fed. Appx. at 313 (recognizing when jury properly instructed on State's burden of proof, failure to give alibi instruction does not alter that burden).

---

[15]Habeas relief from charge errors in state court is granted by federal courts only for constitutional violations. *Duckett*, 67 F.3d at 744; *Baca*, 956 F.2d 277, at *2 (10th Cir. 1992) (unpublished op.); *Tarpley v. Estelle*, 703 F.2d 157, 160 (5th Cir.1983).

[16]Although not binding authority, we may cite unpublished federal opinions for their persuasive authority. *See* FED. R. CIV. P. 32.1; *Cantu v. Hidalgo County*, 398 S.W.3d 824, 829 n.5 (Tex. App.—Corpus Christi 2012, pet. denied).

In *Geisberg*, the Texas Court of Criminal Appeals held that the assertion of an alibi "constitutes no more than a negation of an essential element of the State's burden of proof; specifically, that appellant committed the offense at the alleged time and location." *Geisberg*, 984 S.W.2d at 246–47. The Court explained,

> A defensive issue which goes no further than to merely negate an element of the offense alleged by the State in its indictment does not place a burden of proof upon a defendant to establish it. The burden of proof is upon the State to prove those allegations. An alibi only traverses those allegations and casts doubt upon whether the State has met its burden. As a result, an alibi is sufficiently embraced in a general charge to the jury that the defendant is presumed innocent until he or she is proven guilty beyond a reasonable doubt. There is ample room within that instruction for a defendant to effectively argue his defense of alibi to a jury.

*Geisberg*, 984 S.W.2d at 250 (citing *Sanders v. State*, 707 S.W.2d. 78, 81 (Tex. Crim. App. 1986)). Thus, Texas law, which does not allow a separate instruction on alibi, conforms to federal constitutional requirements, when properly applied: it allows evidence of the alibi to cast doubt on the State's case, clearly sets forth the State's burden of proof in the general charge, and allows the defendant to argue his alibi and its effect on the State's case to the jury.

In this case, both Brown and his wife provided alibi testimony. Further, in his final argument, Brown stressed (1) the lack of any direct evidence showing that he was ever in Johnson's house, (2) that he is presumed innocent, (3) that the State has the burden to prove its case, and (4) that he was at home in bed at the time of the robbery. He further emphasized that the timeline originally given by Alford and Simpson supported his version of the events of that day. Before closing arguments, the trial court properly instructed the jury regarding the State's burden of proof, informing the jury that the State was required to prove each element of the offense beyond a reasonable doubt and that Brown was presumed innocent until proven guilty. Under the trial

court's instructions, the State necessarily had to prove Brown's presence at Johnson's house at the time of the aggravated robbery in order to secure a conviction. Under these facts, we hold that the trial court's refusal to give the requested alibi instruction did not deprive Brown of either his due process rights or his right to a trial by jury. Therefore, we find that the trial court did not err and overrule this point of error.

## V. The Trial Court Did Not Err in Admitting a Facebook Photograph

In his fourth point of error, Brown complains that the trial court erred in admitting a photograph from his Facebook page during the punishment phase of the trial. The photograph shows Brown sitting and pointing a pistol in the direction of the camera. Brown argues that the photograph was improperly admitted under Rules 403 and 404(b) of the Texas Rules of Evidence. *See* TEX. R. EVID. 403, 404(b).

Under Article 37.07 of the Texas Code of Criminal Procedure, any evidence that the trial court "deems relevant to sentencing" is admissible during the punishment phase of a trial. TEX. CODE CRIM. PROC. ANN. art. 37.07(3)(a)(1) (West Supp. 2014); *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008). If the evidence "will assist the fact-finder in deciding the appropriate sentence in a particular case," it is relevant to the determination of punishment. *Sims*, 273 S.W.3d at 295 (citing *Mendiola v. State*, 21 S.W.3d 282, 285 (Tex. Crim. App. 2000)). Article 37.07(3)(a)(1) allows for the admission of character evidence in the form of both opinion testimony and extraneous-offense evidence, notwithstanding Rules 404 and 405 of the Texas Rules of Evidence. TEX. CODE CRIM. PROC. ANN. art. 37.07(3)(a)(1); *Sims*, 273 S.W.3d at 296–97. Therefore, no error has been shown under Rule 404(b).

28

Nevertheless, even if punishment-phase evidence is deemed relevant, it is subject to analysis under Rule 403.[17] *Rodriguez v. State*, 203 S.W.3d 837, 843 (Tex. Crim. App. 2006). Under this analysis, the trial court may consider "(1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Id.* The trial court is presumed to have engaged in this analysis. *Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997). We review the trial court's analysis under an abuse-of-discretion standard and will only overturn its ruling if it falls outside the "zone of reasonable disagreement." *Rodriguez*, 203 S.W.3d at 843 (quoting *Robbins v. State*, 88 S.W.3d 256, 260 (Tex. Crim. App. 2002)).

The photograph was introduced after the State had previously introduced two prior misdemeanor convictions of Brown for unlawfully carrying a handgun and a prior misdemeanor conviction for engaging in deadly conduct. In addition, the State pointed out that the pistol in the photograph was similar to the one used in the aggravated robbery. Although Brown argued at trial and in his brief that the gun may not be real, the trial court reasonably could have found that the photograph, when considered with his prior convictions, was probative of Brown's character for violence. Brown argues on appeal that the photograph "plays on the fears of the jury." However, the trial court, in light of Brown's conviction in this case and his prior convictions, reasonably could have found that the photograph would not unduly lead the jury to base its decision on an

---

[17]Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403.

irrational, improper basis. *See Ex parte Rogers*, 369 S.W.3d 858, 863 (Tex. Crim. App. 2012) (citing *Ex parte Lane*, 303 S.W.3d 702, 715 (Tex. Crim. App. 2009)). In addition, the photograph was authenticated and introduced into evidence through the testimony of Brown's wife in a brief and straightforward manner, consisting of less than one page in the reporter's record. Although the State may not have had a pressing need for the evidence, we do not find that this one factor outweighs the other factors supporting the admissibility of the evidence. Under these facts, we hold that the trial court did not abuse its discretion in admitting the photograph during the punishment phase of Brown's trial. We overrule this point of error.

## VI.     The Trial Court Did Not Err in Admitting the Non-Discovered 9-1-1 Audio Recording

In his final point of error, Brown complains of the trial court's admission of an audio recording of Alford's telephone call to 9-1-1. During her direct testimony, Alford testified that she heard a radio broadcast concerning the robbery which requested that anyone possessing relevant information contact law enforcement officials. According to Alford, the radio broadcast aired at approximately 5:00 p.m. on the day of the robbery. Alford further testified that upon hearing the report, she called the "Gregg County Police Department" to report information she thought might be related to the robbery. Although she never specifically testified that she placed the law enforcement call at 5:00 p.m., her testimony was capable of leaving that impression. Prior to trial, the State produced an offense report to defense counsel discussing Alford's call. Although it is not clear because the report is not in evidence, it appears from the arguments of counsel that the time listed in the offense report was significantly later than 5:00 p.m. On cross-examination, Alford testified that she had called the 9-1-1 emergency services number to make her report and

30

that she was redirected to four different departments within the Gregg County Sheriff's Department before Officer Mitchell eventually called her back around 8:30 p.m. or 9:00 p.m.

Believing that Brown had attacked Alford's credibility on this ancillary matter, however, the State sought to introduce the 9-1-1 recording to verify that Alford did, in fact, make the call at approximately 5:00 p.m. on the day of the robbery. Although Brown acknowledged at trial that the State only obtained a copy of the 9-1-1 recording after Alford testified at trial and that the State immediately provided him a copy, which he reviewed during the lunch break, Brown objected to the admission of the audio recording, claiming that it was "inappropriate to introduce the evidence at this point" since he had not been "given it prior to the time of trial." On appeal, Brown complains that the recording should not have been admitted because the State did not produce it prior to jury selection in violation of the trial court's standing discovery order.[18]

_____

[18]It is questionable whether Brown preserved this point for appeal. Under Rule 33.1(a) of the Texas Rules of Appellate Procedure, an issue is not preserved for appeal unless the record shows that it was presented to the trial court "by a timely request, objection or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A); *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009). At trial, Brown did not specifically object to the admission of this evidence based on the State's violation of the standing pretrial order, but on the timeliness of its production. We can conceive of several potential sources for the State's duty to produce the tape—Article 39.14 of the Texas Code of Criminal Procedure, a specific ruling by the trial court on a defense motion specifically requesting the recording, or a standing discovery order. To vaguely object that the recording was not produced timely without also stating upon what basis the State was required to do so would leave the trial court to speculate about the basis of Brown's complaint.

On the other hand, "[n]o 'magic words' are required to preserve an objection at trial. An objection is considered in the context in which the complaint was made and the parties' shared understanding of the complaint at that time." *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011) (citing *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) ("Straightforward communication in plain English will always suffice. [ . . .] "[A]ll a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."). Brown objected that the 9-1-1 tape was not produced to him before trial, and here he claims the standing order required the State to produce the 9-1-1 tape to him before trial. State's counsel did not assert it had no duty to produce the tape, only that it could not have done so because it did not anticipate it would be an issue at trial. The record does not reflect confusion on the part of the trial court, State's counsel, or defense counsel on the basis for the State's duty to produce the tape. Accordingly, we will consider this point of error.

The Court of Criminal Appeals has held that

"[E]vidence willfully withheld from disclosure under a discovery order should be excluded from evidence[.]" [*Hollowell v. State*, 571 S.W.2d 179, 180 (Tex. Crim. App. 1978)]. Because exclusion of evidence in this context is in the nature of a court-fashioned sanction for prosecutorial misconduct, whether the trial court should exclude evidence on this basis has been made to hinge on "whether the prosecutor acted with the specific intent to willfully disobey the discovery order[.]" [*Oprean v. State*, 201 S.W.3d 724, 727 (Tex. Crim. App. 2006)]. Extreme negligence or even recklessness on the prosecutor's part in failing to comply with a discovery order will not, standing alone, justify the sanction of excluding relevant evidence. [*State v. Larue*, 152 S.W.3d 95, 97 (Tex. Crim. App. 2004)].

*Francis v. State*, 428 S.W.3d 850, 854–55 (Tex. Crim. App. 2014). On appeal, the trial court's ruling on a motion to exclude evidence for "willful prosecutorial defiance of a discovery order" is reviewed "under an abuse of discretion standard," and the appellate court will "defer to any trial-level ruling that falls within the zone of reasonable disagreement." *Francis*, 428 S.W.3d at 855. "In the absence of any specific findings of fact from the trial court (either oral or written) spread [sic]on the record, a reviewing court must assume that the trial court resolved all fact issues in a way that is consistent with its ultimate ruling, so long as those presumed findings are supported by the record." *Id*.

In addition,

[w]hether the prosecutor intended to willfully disobey the discovery order may be inferred from the prosecutor's actions and words. *See Oprean,* 201 S.W.3d at 728. "[W]e consider whether the record indicates that (1) the prosecutor intended to harm the defense, (2) the prosecutor's actions were a strategic and purposeful effort to thwart the defense's preparation of its case, or (3) the prosecutor consciously decided to violate the plain directive of the discovery order." *Walker,* 321 S.W.3d at 22; *see Oprean,* 201 S.W.3d at 727–28. We also consider the validity of the prosecutor's rationale and explanation for violating the discovery order, as well as whether the prosecutor suddenly discovered the evidence such that compliance with the terms of the discovery order was impossible. *Oprean,* 201 S.W.3d at 727–28.

32

*Francis v. State*, 445 S.W.3d 307, 313 (Tex. App. – Houston [1ˢᵗ Dist.] 2013), aff'd, 428 S.W.3d 850 (Tex. Crim. App. 2014). Nevertheless, where the presence of willful non-compliance with the trial court's discovery order "turn[s] on the credibility of the prosecutor's explanations and of her assertions that she was not even aware until the morning of trial that the discovery order had not been satisfied . . . . we owe almost absolute deference to the trial court's implicit conclusion that the prosecutor's conduct was less than willful." *Francis*, 428 S.W.3d at 855.

In the present case, there is no evidence that the State's attorney "intended to harm the defense," that the State prosecutor executed a "strategic and purposeful effort to thwart the defense's preparation of its case," or that the State's attorney "consciously decided to violate the plain directive of the discovery order." *Francis*, 445 S.W.3d at 313. The State's attorney stated that she did not anticipate that Alford's credibility over whether she called law enforcement at 5:00 p.m. would be contested in the case until after defense counsel cross-examined Ms. Alford. The 9-1-1 recording was not part of the State's case-in-chief against Brown, but was rebuttal evidence produced to respond to an issue made by Brown's counsel on cross-examination. In this instance, Brown made Alford's credibility about the timing of her call to law enforcement a contested issue, not the State, and the State could not have known her credibility on that issue would be contested until Brown's attorney cross-examined Alford on this point.[19]

_____

[19]In determining whether the State violated the notice requirements of Texas Evidence Rule 404(b) and Article 37.07 of the Texas Code of Criminal Procedure, the Texas Court of Criminal Appeals has held that where the non-disclosed evidence was presented by the State in rebuttal of the defendant's evidence rather than as part of its case-in-chief, no violation occurred. *See Jaubert v. State*, 74 S.W.3d 1, 4 (Tex. Crim. App. 2002) ("We have held that when the State presents extraneous offense evidence in rebuttal to mitigation evidence offered by the defendant, advance notice of intent to offer the extraneous offense evidence is not possible: 'In such a situation, the defendant, rather than the State, determines whether a contested issue will be raised, and his determination will not be known until he presents his

Moreover, resolution of this issue turns on the "credibility of the prosecutor's explanations," and "we owe almost complete deference to the trial court's implicit conclusion that the prosecutor's conduct was less than willful." *Francis*, 428 S.W.3d at 855. Accordingly, we find that the trial court did not abuse its discretion in overruling Brown's objection to the mid-trial production of the 9-1-1 recording.[20] We overrule this point of error.

We affirm the trial court's judgment.

Ralph K. Burgess
Justice

Date Submitted:     May 14, 2015
Date Decided:      July 20, 2015

Do Not Publish

---

case. It would be practically impossible for the State to give notice until that time.'" (quoting *Gipson v. State*, 619 S.W.2d 169, 170–71 (Tex. Crim. App. 1981))).

[20]On appeal, Brown argues that the State violated that portion of the standing pretrial order that requires the State to produce, prior to jury selection:

> "6.     All documents, objects and tangible things which are in the custody and control of the State or any of the State's agents as a result of the investigation which resulted in charges being brought and which are material evidence in this case as to Defendant's guilt or innocence or as to punishment, if any."

Brown does not contend that the 9-1-1 call contained any material evidence as to his guilt or innocence. Indeed, the only purpose of introducing the call was to establish the time that Alford made the call. As the State points out in its brief, the timing of this call would be immaterial to its case against Brown and only became material after Alford was cross-examined on this ancillary matter. Under these circumstances, the trial court could also have found that the State did not violate its standing pretrial order.

34